**ELF ATOCHEM NORTH AMERICA, INC.**

v.

**UNITED STATES of America.**

Civ. A. No. 92–7458.

United States District Court, E.D. Pennsylvania.

Sept. 22, 1994.

Michael A. Bogdonoff, William J. Kennedy, Frederick G. Herold, Eli R. Brill, Dechert, Price and Rhoads, Philadelphia, PA, for Elf Atochem North America, Inc.

Mark R. Kmetz, U.S. Attorney's Office, Philadelphia, PA, Brud Rossman, U.S. Dept. of Justice, Environmental Defense Section, Timothy Burns, U.S. Dept. of Justice, Environmental & Natural Resources Div., Jonathan A. Marks, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, for the U.S.

Brud Rossmann, U.S. Dept. of Justice, Environmental Defense Section, Timothy Burns, U.S. Dept. of Justice, Environmental & Natural Resources Div., Washington, DC, for U.S. Dept. of Commerce, Gen. Services Admin., U.S. Dept. of Defense, U.S. Dept. of Army.

Brud Rossmann, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, for Barbara Franklin, Richard G. Austin and Dick Cheney.

Michael R. Lazerwitz, Charles F. Lettow, Christopher G. Smith, Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for Witco Corp.

## MEMORANDUM

JOYNER, District Judge.

Plaintiff, Elf Atochem North America Inc. (Elf),[1] seeks partial summary judgment and declaratory judgment on the issue of the United States' liability as an owner under section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.A. §§ 9601–75 (1983 & Supp.1994) (CERCLA).

Elf's claim against the United States is based on business activities that took place during World War Two. Elf's predecessor in interest leased the equipment necessary to produce the pesticide DDT from the United States Defense Plant Corporation in 1944. DDT was vital to the United States' war effort in Europe and was labeled a strategic pesticide. The War Production Board rated DDT AA1, which meant that the government would help expedite DDT producers' expansion efforts. Today, the land and ground water on and around Elf's DDT factory (the Site) are contaminated with chlorobenzene and benzene, which are used in the manufacture of DDT, as well as other chemicals.

In 1983, the Environmental Protection Agency (the EPA) placed the Site on the National Priorities List. In 1992, Elf and the EPA entered into a consent decree that requires Elf to remediate the Site, but allows it to seek contribution from other sources. Accordingly, Elf has sued the United States for contribution on the grounds that the United States is liable as an owner, operator and arranger within the meaning of CERCLA. This motion seeks summary judgment only on the issue of the United States' liability as an owner. CERCLA authorizes courts to enter declaratory judgments on liability

---

1. Witco Corporation, a defendant in the related case of United States v. Witco Corporation, No. 94–0662, has joined Elf's request for partial summary judgment in this case.

for response costs or damages pursuant to 42 U.S.C.A. § 9613.

## SUMMARY JUDGMENT STANDARD

In considering a motion for summary judgment, the court must consider whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the nonmoving party. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)).

## CERCLA

■ CERCLA makes liable "any person who at the time of disposal of any hazardous substance owned or operated any facility at which time such hazardous substances were disposed … from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance." 42 U.S.C.A. § 9607(a)(2). CERCLA defines "facility" to include equipment (42 U.S.C.A. § 9601(9)(A)) and gives the word "disposed" the same meaning that it has in the Solid Waste Disposal Act. 42 U.S.C.A. §§ 6901–87 (1983 & Supp.1994). That act defines disposal as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."

42 U.S.C.A. § 6903(3). Under CERCLA even an owner that does "not have any control over the disposal activity" is still liable for waste disposed of at its facilities. *United States v. A & N Cleaners & Launderers, Inc.*, 788 F.Supp. 1317, 1332 (S.D.N.Y.1992).

Whether a party falls within CERCLA's § 9607 can be decided summarily if there are no genuine issues of material fact. Once a finding of liability is made, courts are directed to enter a declaratory judgment on liability for response costs or damages. 42 U.S.C.A. § 9613(g)(2). The facts relevant to this issue are undisputed, accordingly, Elf's motion for partial summary judgment will prevail if it shows that the United States 1) owned 2) a facility 3) at which hazardous substances 4) were disposed 5) and from which there is a release or threatened release 6) for which response costs have been incurred.

### 1. Owner

The United States, through its entity the Defense Plant Corporation, owned and leased the components most important to the production of DDT to Elf. Elf contends, and the United States does not contest, that this ownership and subsequent leasing of the equipment is sufficient "ownership" within the meaning of CERCLA. Accordingly, Elf has met the first element of the § 9607 test.

### 2. Facility

CERCLA defines a facility to include "any building, structure, installation, *equipment, pipe or pipeline.*" § 9601(9)(A) (emphasis added). The United States leased equipment to Elf that was used to make DDT. Elf contends, and the United States does not contest, that this equipment qualifies as a "facility" within the meaning of CERCLA. Accordingly, Elf has met the second part of the § 9607 test.

### 3. Hazardous Waste

CERCLA defines hazardous waste in general terms. A number of substances are specifically designated as hazardous substances and CERCLA expands the list to include substances that have the characteris-

tics of the enumerated substances. 42 U.S.C.A. § 9601(14). Elf contends, and the United States does not dispute, that the substances found at the Site are hazardous substances within the meaning of CERCLA. Accordingly, Elf has met the third part of the § 9607 test.

### 4. Disposal

Whether there was a "disposal" of hazardous wastes at the facility that the United States owned is the main issue in this matter. Considering the voluminous nature of Superfund litigation, there is surprisingly little authority on the exact nature of a "disposal" and virtually none on this issue. *Amland Props. Corp. v. Aluminum Co.*, 711 F.Supp. 784, 791 (D.N.J.1989). The precise question at bar is whether the United States disposed of waste when it discharged hazardous materials from its equipment or whether there was no disposal until the materials entered the waste pond.

CERCLA was enacted to remediate abandoned and inactive hazardous waste disposal sites. H.R.Rep. No. 1016, 96th Cong.2d Sess. 22 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6125. It was not intended to cover waste produced within factories that is then "reclaimed or put to a new use and is therefore not a part of the discarded materials disposal problem." H.R.Rep. No. 1491, 94th Cong.2d Sess. 2 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6238, 6240.

Many circuits have held that a "disposal" requires an affirmative act of disposing of waste. The inquiry that has been most important in other CERCLA disposal cases has been whether the hazardous materials were "disposed of" in the sense that the materials were considered waste and were thrown out, got rid of or dumped. *Prudential Ins. Co. v. United States Gypsum Co.*, 711 F.Supp. 1244, 1253 (D.N.J.1989), citing Webster's New Universal Unabridged Dictionary 529 (2d ed. 1983) (disposal defined as "a giving

away, transfer, bestowal ... a disposing of; getting rid of.").

This reading of "disposal" removes from CERCLA's coverage the productive use of hazardous substances. So, when asbestos was used to insulate a building, the Ninth Circuit held that there was no disposal because there was no affirmative act of discarding the hazardous materials as waste, but rather there was productive use of the materials. *3550 Stevens Creek Assoc. v. Barclays Bank*, 915 F.2d 1355, 1362 (9th Cir.1990), *cert. denied*, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). In contrast, when hazardous materials were deposited within a warehouse as a layer of dust and then released to the environment when carried out on the stored goods and the clothing and shoes of employees, this Court held that the dust was disposed of as waste. *BCW Assoc. Ltd. v. Occidental Chem. Corp.*, No. 86–5947, 1988 WESTLAW 102641 (E.D.Pa. Sept. 29, 1988).

■ Elf asserts that three waste streams were created and disposed of at the facilities owned by the United States.[2] The first stream resulted from hydrochloric acid plus organics piped directly from a United States-owned machine to an outdoor waste pond. The second stream came from black sulfuric acid plus organics piped directly from another United States-owned machine to the waste pond. The third stream consisted of reddish sulfuric acid plus organics including DDT particles and unreacted monochlorobenzene were sent to the waste pond through pipes when a valve was opened at the bottom of a United States-owned machine.

■ Elf argues that the caselaw, especially *Reading Company. v. City of Philadelphia*, 155 B.R. 890 (E.D.Pa.1993), supports its theory that these three waste streams were disposed of *at* the United States-owned machines. A related case, *Reading Co. v. City of Philadelphia*, 823 F.Supp. 1218

---

2. Elf also alleges that other waste streams existed that make the United States subject to owner liability under CERCLA. The United States contests these allegations. It argues that Elf has not shown an absence of material fact that these waste streams ever entered the environment. Because we must take the non-movant's allega-

tions as true for the purposes of a summary judgment motion, we hold that there is a genuine issue of material fact regarding these other waste streams. Accordingly, Elf's motion for partial summary judgment on liability is DENIED as to waste streams beyond these three uncontested ones.

(E.D.Pa.1993), held that when disposal of waste is inherent to the productive use of a substance, there is a disposal whenever the productive use occurs. *Id.* at 1237–38.

First, Elf contends that when the three waste streams left the United States' equipment, that it was considered waste. The United States does not contend that the streams were intended to be used further, reclaimed, or have some additional productive purpose. Therefore, we find that the materials leaving the United States' equipment was waste that could be disposed of within the meaning of § 9607.

The second and more significant question is, was this waste disposed of *at* the United States' equipment. Elf contends that it was. The United States, however, argues that there was no disposal *at* its facilities because any discharge from its equipment was piped in Elf-owned pipes to the waste pond. It argues that since the actual release into the environment took place at the waste pond, that the only disposal at a facility was at the point where the pipes discharged the waste into the waste pond.

In *BCW*, this Court held that when a company created lead dust within its facility, that it was disposed of there. This was so even though the lead dust was not released into the environment until it was carried out of the warehouse on the clothing of its employees. The Court specifically rejected the defendant's argument that because the dust was deposited within a warehouse that it was not disposed of "into or on any land or water" under CERCLA. 1988 WESTLAW 102641 at *17.

Likewise, in *Reading Co.*, this Court expressly rejected the defendant's argument that "unintended or incidental discharges of hazardous substances that occur as a side effect of a productive use of these substances do not qualify as disposals under CERCLA." 823 F.Supp. at 1235. It held, instead, that there was a disposal when PCBs leaked from transformers onto railroad tracks, even though the transformers were in active and productive use at the time of the discharges. *Id.* at 1237.

In its support, the government cites cases that allegedly hold that "disposal" requires exposure to the environment (*Guidice v. BFG Electroplating & Mfg. Co.*, 732 F.Supp. 556, 564 (W.D.Pa.1989)) and that discharges within a closed environment do not constitute a disposal. *3550 Stevens Creek*, 915 F.2d at 1362; *Tragarz v. Keene Corp.*, 980 F.2d 411, 427 (7th Cir.1992). Despite the United States' reliance on these cases, they are not helpful on this issue. Rather than the broad holding the United States reads into *Guidice*, that case held in fact that the terms release and disposal are not synonymous, although they commonly occur together. 732 F.Supp. at 564. The other cases the United States cites concern asbestos litigation. These cases are not analogous because the asbestos in those cases was used in a productive manner, whereas here, the materials coming from the United States' equipment was waste. *See 3550 Stevens Creek*, 915 F.2d at 1362; *Tragarz*, 980 F.2d at 427.

Although the question is admittedly close, given the decided cases and the intent of Congress in enacting CERCLA, for the following reasons we conclude that the United States did dispose of hazardous materials from its equipment.

First, as discussed above, the United States' equipment created waste and not productive material. Second, the waste was sent from the United States' equipment to pipes that brought the waste to a waste pond. We find that when each of the waste streams left the United States' equipment it was being sent to the pipes as a means of getting rid of it, transferring it, throwing it out; in other words, disposing of it. We hold that this disposal is a disposal at a facility under § 9607. Accordingly, Elf has met the fourth part of the § 9607 test.

### 5. Release or Threatened Release

■ CERCLA does not impose liability until there has been a release of the disposed hazardous materials into the environment. 42 U.S.C.A. § 9607. Elf contends that there has been a release of contaminants because the definition of a release includes the word "disposal" and because the EPA's Record of

Decision for the Site declares that there was a release of the waste at the waste pool.

The United States argues that there has been no release because any waste was discharged into Elf's pipes and not released into the environment. It cites as support for its proposition *Mead Corp. v. United States,* No. C–2–92–326, slip op. (S.D.Ohio Jan 14, 1994). This case held that there was no release of hazardous waste when government-owned equipment produced hazardous waste that was disposed of on the plaintiff's property. The Court feared that it would improperly merge owner liability into generator liability to find a release under CERCLA when the release occurs at a time separate from the disposal. *Id.* slip op. at 9–10. The Court cited, but disagreed with *FMC Corp. v. United States Department of Commerce,* 786 F.Supp. 471, 486 (E.D.Pa. 1992).

First, we find the United States' definition of "release" to be too narrow. The word release is to be construed broadly. *Amland,* 711 F.Supp. at 793 ("As with the term 'disposal' courts have been inclined to give a broad reading to the terms 'release' and 'threatened release.'"). Courts have held that there need only be an eventual release, not an actual or imminent one. *Id.* Second, we decline to follow the lead of the Southern District of Ohio in *Mead.* Here, waste was disposed of into pipes leading directly to an outdoor waste pond. Given this situation, the Southern District of Ohio's fears that owner liability could be merged into generator liability are unfounded. The United States is not being sued for creating waste that was later released into the environment through no fault of its own. Rather, the United States is being sued for disposing of its waste directly from its equipment into pipes that lead directly to the environment.

This Court has found a threatened release when hazardous dust was distributed within a warehouse because the dust could be carried out on the warehoused goods and on the clothes and shoes of employees. *BCW Assoc.,* 1988 WESTLAW 102641 at *17. Similarly, this Court found a threatened release when PCBs were leaked onto the floor of a building because the PCBs could seep from the building (not considered the environment under CERCLA) into the environment. *Reading Co.,* 823 F.Supp. at 1238; *see also Amland,* 711 F.Supp. at 793 (threatened release when PCBs might migrate through a concrete floor onto ground). The Eastern District of California found a release under almost identical facts to the ones at bar. In *Lincoln Props. v. Higgins,* No. S–91–760DFL/GGH, 1993 WESTLAW 217429 (E.D.Cal. Jan. 21, 1993), lessees of property were sued under CERCLA when hazardous waste they disposed of through the lessor's sewer pipes contaminated ground water. The lessees argued that there was no release into the environment because the hazardous wastes were disposed of into pipes owned by a third party. The Court disagreed, and held that CERCLA "does not on its face provide that a release into the environment must be 'direct.'" *Id.* at *20. Accordingly, it held the lessees were liable for a release.

We find *BCW, Reading* and *Lincoln* to be analogous to this case, and more persuasive than *Mead.* Here, the United States disposed of its waste into Elf's pipes; pipes which led directly into an outdoor waste pit. There was no doubt that once the waste entered the pipes that the waste would enter the environment. In other cases where defendants disposed of their waste onto their property, employees and products, courts have found a threatened release. Here, where the release was actually imminent, we find a threatened release. Accordingly, Elf has met the fifth part of the § 9607 test.

### 6. Incurrence of Response Costs

Elf contends, and the United States does not contest, that Elf has incurred response costs consistent with the National Contingency Plan to remediate the Site. Because liability only is at issue here, it is irrelevant how much the response costs are. It is only relevant that they have been incurred and that they are consistent with the National Contingency Plan. Because it is undisputed that Elf has incurred such costs, Elf has met the sixth and final part of the § 9607 test.

### CONCLUSION

█ Because the Court finds that the United States owned facilities (the equip-

ment) that disposed of hazardous waste that was released into the environment and caused the incurrence of response costs, the Court concludes that the United States is liable as an owner under § 9607(a)(2). Accordingly, Plaintiff's Motion for partial summary judgment is granted.

### ORDER

AND NOW, this 22nd day of September, 1994, upon consideration of Plaintiff's Motion for Partial Summary Judgment Against Defendant United States of America, and the responses thereto, the Motion is hereby GRANTED in part.

It is hereby ORDERED and DECLARED that the United States was an owner of facilities at the Pittstown, New Jersey Site described in the Complaint, from which three waste streams resulted. These waste streams are as follows: 1) hydrochloric acid plus organics piped from an HCL absorber to the waste pond 2) black sulfuric acid plus organics piped from a Phaudler reactor to the waste pond and 3) reddish sulfuric acid plus organics including DDT particles and unreacted monochlorobenzenes from a sight box in a Phaudler reactor to the waste pond. The United States is liable under 42 U.S.C.A. § 9607(a)(2) as an owner for past and future response costs associated with these waste streams at the Site in an amount to be determined later.