**ROSPATCH JESSCO CORPORATION,**
Plaintiff,

v.

**CHRYSLER CORPORATION; William Perry, Secretary, United States Department of Defense; and Michael B. Donley, Acting Secretary, United States Air Force, Defendants.**

No. 4:93–CV–47.

United States District Court,
W.D. Michigan,
Southern Division.

Filed Aug. 8, 1995.

As Amended Aug. 11, 1995.

Jon F. DeWitt, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for Rospatch Jessco Corp.

Steven C. Kohl, Howard & Howard, P.C., Bloomfield Hills, MI, for Chrysler Corp.

Michael L. Shiparski, Asst. U.S. Atty., Michael H. Dettmer, U.S. Atty., Grand Rapids, MI, John C. Nagle, U.S. Dept. of Justice, Environment & Natural Resources Div., Environmental Defense Section, Washington, DC, Major David R. Vecera, Air Force Legal Services Agency, Environmental Litigation Branch, Arlington, VA, Robin M. Richardson, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, for Les Aspin, Dept. of Defense, Michael B. Donley, U.S. Air Force.

Robin M. Richardson, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, for Dept. of Defense, U.S.

## OPINION

ROBERT HOLMES BELL, District Judge.

Plaintiff Rospatch Jessco Corporation ("Rospatch") filed this action pursuant to Sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607 and 9613, seeking to recover costs which it incurred in responding to alleged releases of hazardous substances at its Dowagiac, Michigan, manufacturing plant ("the Dowagiac plant"), and for a declaratory judgment that the defendants are liable for future costs that it may incur as a result of those releases. Defendant Chrysler Corporation ("Chrysler") filed a cross-claim against the other defendants (collectively referred to herein as "the United States") for contribution pursuant to Sections 107(a)(2), (3) and 113(f)(1) of CERCLA. 42 U.S.C. §§ 9607(a)(2), (3) and 9613(f)(1).

Rospatch seeks to hold the defendants liable for the United States' and Kaiser–Frazer Corporation's [1] aircraft engine production activities at the Dowagiac plant during the Korean Conflict. Before the Court at this time is Chrysler's motion for partial summary judgment, joined in by Rospatch, against the United States on the issue whether the United States was an "owner or operator" of the Dowagiac plant within the meaning of CERCLA. The United States has filed a cross-motion for summary judgment concerning the same issue.

### I

Rospatch is a furniture manufacturer in Dowagiac, Michigan. It has incurred costs in connection with a clean up of soil and groundwater contamination at the Dowagiac plant. Rospatch has owned the plant since February 29, 1972. The plant was first owned by the Round Oak Stove Company,

---

1. Defendant Chrysler Corporation is the successor to Kaiser Manufacturing Corporation, with regard to CERCLA liability.

which used the plant as a foundry from around the turn of the century until it sold the plant to the Kaiser–Frazer Corporation (K–F) on June 16, 1947. K–F, which was making a concentrated effort to establish itself as a major producer of automobiles following World War II, continued to use the plant as a foundry until late 1950 or early 1951. The plant then went unused for a period of time.

But K–F was vastly undercapitalized to compete with the major domestic automakers. By April 1949, K–F was in default of $16,000,000 in loans with the Mellon and Giannini banks and faced the threat of liquidation. The Reconstruction Finance Corporation ("RFC"), however, provided substantial loan assistance to K–F to prevent its failure.[2] In November 1949, the RFC loaned $34,400,000 to K–F and $10,000,000 to Kaiser–Frazer Sales Corporation ("K–F SC"), one of its wholly-owned subsidiaries. The purpose of these loans was to provide assistance to K–F with regard to its automobile production and sales, particularly with the development and production of new designs. As collateral for the loan to K–F, K–F gave the RFC a mortgage on all of K–F's land, buildings, machinery and equipment located in Michigan, California, and Pennsylvania, and pledged, with voting rights, all of the capital stock of K–F's wholly-owned subsidiaries, including K–F SC and Phoenix Iron Work. The loan agreements also permitted the RFC to designate its representative to K–F's Board of Directors.[3]

In December 1950, the RFC loaned an additional $25,000,000 to K–F SC for use in K–F's automobile production and sales. The terms of this loan required K–F to reduce its level of production of automobiles to not more than fifty percent of its October 12, 1950 level, and to make "conscientious efforts to obtain defense work and give priority to any such work obtained over the production of automobiles."

That very month, K–F entered into an agreement with the Air Force to produce C–119 aircraft. This contract, which was a "cost-plus-a-fixed-fee supply contract", resulted from the Air Force's perception that the Fairchild Corporation ("Fairchild"), the holder of the rights to produce the C–119 aircraft, would not be able to produce the aircraft at the rate desired by the Air Force. The contract originally called for delivery of the first aircraft by August 1951 with a delivery rate of twenty per month by December 1951, at a unit price of $839,955 per aircraft. In fact, the first aircraft was not delivered until May 1952 and the maximum delivered in any one month was eight; additionally, the actual average unit price swelled to $1,248,586. For these reasons, the Air Force cancelled the remainder of its C–119 contract with K–F and Fairchild produced the remaining aircraft.[4]

K-F entered into another defense contract in February 1951. K–F apparently submitted a bid concerning an Air Force contract for the production of 410 R–1300 aircraft engines in conjunction with Curtiss–Wright Corporation's Wright Aeronautical Division ("Wright").[5] The Air Force accepted K–F's bid and, in February 1951, entered into a letter contract whereby K–F would produce the engines in accordance with specifications provided by Wright. This R–1300 contract was comprised of a "Facilities Contract" and a "Supply Contract" (collectively referred to as "the contract" or "the R–1300 contract"). K–F and the Air Force entered into defini-

---

2. Previous to this, K–F had borrowed $13,590,000 from the General Services Administration in December 1948, which it used to purchase its massive Willow Run plant.

3. It appears that the RFC did not so designate a representative to be elected to K–F's Board of Directors until July 31, 1952, when it designated Alan E. Schwartz, a partner of a Detroit law firm.

4. Fairchild produced the C–119 aircraft at a unit price of $260,000. The Air Force concluded that the "loss of a relatively short time" that it suf-

fered by having Fairchild produce all of the remaining aircraft alone was worth the substantial savings the United States would realize.

5. K–F had previously entered into another defense contract with the United States, for the production of component parts for Lockheed's P2V "Neptune" patrol bomber, which it produced in its Oakland, California plant, and subsequently entered into at least one other defense contract, for the production of C–123 aircraft, which it produced at its Willow Run plant.

tive facilities and supply contracts in the Spring of 1952. Pursuant to the Facilities Contract, the Air Force agreed to supply K–F with any equipment and machinery necessary to produce the engines which K–F did not already have. The Air Force would permit K–F to use equipment and machinery from government depots in which unused equipment and machinery was stored. When K–F was unable to locate equipment or machinery in these depots, it was permitted to purchase it new, for which the Air Force would reimburse it. The equipment and machinery provided by the government would remain government-owned throughout the performance of the contract and the severable equipment and machinery would be returned to the government at the conclusion of the contract. This arrangement applied to non-severable items as well, provided that, at the expiration or termination of the contract, the Air Force could require K–F to purchase these non-severable items at cost minus depreciation. The Supply Contract, unlike the C–119 contract, was a standard fixed-price redeterminable supply contract.

During the Spring of 1951, K–F negotiated with Bank of America to obtain a loan to finance its performance of the C–119 and the R–1300 contracts. The $25,000,000 loan was guaranteed in part by the Air Force pursuant to the Defense Production Act of 1950 and Regulation V enacted pursuant to that Act. Bank of America, however, had two conditions for its loaning of this money: that K–F consolidate all of its defense contracts into a single entity which would perform only defense work, and that the General Services Administration and the RFC waive all principal payments due them during the term of the proposed "V-loan". The United States consented to these conditions. Consequently, on May 14, 1951, K–F changed the name of one of its subsidiaries, Phoenix Iron Work, to Kaiser Manufacturing Corporation ("KMC"), and amended the corporate purpose of that corporation to permit it to perform work required by the defense contracts.

The RFC, as pledgee with voting rights of the capital stock of Phoenix Iron Work, approved both of these changes.[6] Moreover, the Air Force agreed to K–F's assignment of the C–119 and the R–1300 contracts to KMC on July 16, 1951.

K-F initially thought that it would be able to produce all of the R–1300 engines with its then-existing idle commercial engine capacity at its Detroit plant. But after a thorough analysis of the component parts necessary for the production of the R–1300 engine, K–F realized that production of the engines required a specialized setup for heat treatment and plating. K–F therefore decided to convert the Dowagiac plant from a foundry to a plant in which it could produce the R–1300 engines. To facilitate the production of aircraft engines at the Dowagiac facility, K–F removed all of the existing foundry equipment such that the building was essentially nothing more than a shell. It then proceeded to obtain that equipment and machinery which was available in the government depots and to purchase other equipment and machinery which it needed.

While K–F was refurbishing the plant, the Air Force had a number of its personnel on-site to oversee K–F's installation of the government-owned equipment and machinery. Once KMC began production of the engines, however, the Air Force's presence at the plant was reduced generally to one person who monitored KMC's quality control.

At the conclusion of the R–1300 contract in about February 1954, KMC had produced 1908 aircraft engines. It is unclear exactly what happened to the plant after this, but it appears that KMC produced parts for General Motors Corporation's hydramatic transmissions for a brief time. By September 1954, however, most of the government-owned severable equipment and machinery had been dismantled and returned to government depots, and it appears that the plant sat idle until November 1954 when KMC, with the United States' permission, sold the

6. It is unclear who initially appointed the board of directors of KMC. But by proxies dated December 1 and 3, 1952, respectively, the RFC and K–F appointed Alan E. Schwartz as their proxy, and on December 5, 1952, Mr. Schwartz voted to elect Joseph W. Frazer, John L. Hallett, Walston S. Brown, Edgar F. Kaiser, J.F. Reis, and S.A. Girard as KMC's directors. None of these individuals appears to be related to the United States in any manner.

plant, including the non-severable items which were valued at $1,250,000. The Court presumes, although it is unaware of any evidence to this effect, that K–F paid the United States for these items out of the sale proceeds, since the United States had the right to demand reimbursement. It further appears that either the United States or KMC sold many of the severable items which KMC had used in its plating department, apparently including Udylite Tanks and Mallory Rectifiers, to a company in Chicago.

## II

Section 107 of CERCLA provides that

> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of... shall be liable for—
>
> > (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan....

42 U.S.C. § 9607(a). The parties' motions for summary judgment, therefore, raise the question whether the United States is liable as a former owner or operator of a facility with regard to KMC's production of R–1300 aircraft engines from 1951 until 1954.

The parties seek summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In its resolving of these motions, the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–53, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). If the moving party carries its burden of showing that there is an absence of evidence to support a claim, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for

trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Thus, the party opposing the motion must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. at 2514.

## III

In their motions for partial summary judgment, Chrysler and Rospatch assert that the United States exercised sufficient control over KMC's operations at the Dowagiac plant to subject it to CERCLA liability as an operator of that plant. In its motion, on the other hand, the United States asserts that it is entitled to summary judgment on this issue. The Court rejects Chrysler's and Rospatch's assertion and will grant the United States' motion for summary judgment on this issue since the application of the commonly applied control test leads the Court to this conclusion. Furthermore, it appears that a recent Sixth Circuit case compels the same result, with which case the Court begins it analysis.

## A

Subsequent to the parties' briefing and arguing of this case, the Sixth Circuit Court of Appeals rendered an opinion which may have application in the present case. The case, *United States v. Cordova Chem. Co.,* 59 F.3d 584 (6th Cir.1995) (*rev'g in part, CPC Int'l. Inc. v. Aerojet–General Corp.,* 777 F.Supp. 549 (W.D.Mich.1991)), involved the scope of the "operator" liability of a parent corporation for the release of hazardous substances that occurred while its subsidiary operated a facility.

In *CPC Int'l,* Judge Hillman concluded that, in addition to the situation where the corporate veil is pierced under state law, "[a] parent's actual participation in and control of a subsidiary's functions and decision-making creates 'operator' liability under CERCLA; a parent's mere oversight of a subsidiary's business in a manner appropriate and consistent with the investment relationship between a parent and its wholly owner subsid-

iary does not." [7] *CPC Int'l,* 777 F.Supp. at 573. The Sixth Circuit rejected the applicability of a control test, *Cordova,* 59 F.3d at 590, and concluded that "a parent corporation incurs operator liability ... for the conduct of its subsidiary corporation, only when the requirements necessary to pierce the corporate veil are met." *Id.*

■ Since *Cordova* involves the question of a parent corporation's liability for its subsidiary's releases of hazardous substances, it is unclear whether it impacts the present case which involves the question of a person's liability for an unrelated entity's release of hazardous substances. Strictly read, *Cordova* does not apply to the present case. The broad principle, however, for which that case can be read to stand is that operator liability will not extend beyond the person operating a facility absent circumstances which indicate that the Court's not extending liability to another entity would result in the perpetration of a fraud or wrong. It appears that this broader reading of *Cordova* requires the Court to conclude that the United States may not be held liable as an operator with regard to KMC's actions.

### B

Even if the Court were to conclude that *Cordova* is inapplicable to the present case, the Court nevertheless concludes that the United States was not an operator of the Dowagiac plant under the control test. Two recent cases provide an excellent demonstration of the scope of "operator" liability in this context, which the Court will discuss in detail to provide comparisons to the present case. *FMC Corp.*

The first case is *FMC Corp. v. United State Dept. of Commerce,* 29 F.3d 833 (3d Cir.1994) *(en banc).* That case involved the activities of the United States, through the War Production Board (WPB), during World War II. Given the facts of that case, the Third Circuit concluded that the United States was an operator of a facility owned by a private corporation, American Viscose Corporation ("American Viscose").

American Viscose was a manufacturer of textile rayon. *Id.* at 835. At the onset of World War II, the WPB anticipated that the demand for high tenacity rayon, especially for military uses, would far exceed the projected supply. *Id.* Accordingly, the WPB required American Viscose to convert its plant to produce high tenacity rayon. *Id.* at 836.

To implement the conversion of the plant, the United States, through the Defense Plant Corporation ("DPC"), leased government-owned equipment and machinery to American Viscose for use at the plant. *Id.* at 837. The DPC hired Rust Engineering Company to install this equipment. *Id.*

To assure that American Viscose would have the raw materials necessary to produce high tenacity rayon, the United States built and retained ownership of a facility adjacent to American Viscose's to produce sulfuric acid. *Id.* The United States also commissioned Stauffer Chemical Company to build a plant nearby to produce carbon bisulfide. *Id.* The United States controlled the price of the raw materials which American Viscose required, as well as the production level and price of American Viscose's finished product, and thereby "significantly influenced the profit that American Viscose could make at the facility." *Id.*

In 1942, the WPB determined that the labor force in the area would be insufficient to meet the needs of the facility. *Id.* Therefore, the United States obtained draft deferments for American Viscose's personnel at the plant. *Id.* The United States also brought in other workers from other industries and provided housing for some of those workers. *Id.* Moreover, the United States took an active role in the management of American Viscose's employees at that facility,

---

7. The court in *CPC Int'l* applied what has come to be known as the "actual control" test, a test which has been adopted by a number of circuit and district courts. Other courts have adopted the "authority to control" test. Apparently, only the Fifth Circuit has rejected both tests as an avenue for liability to attach to a parent corpora-

tion. *Joslyn Mfg. Co. v. T.L. James & Co.,* 893 F.2d 80, 83 (5th Cir.1990) ("[I]f Congress wanted to extend liability to parent corporations it could have done so, and remains free to do so."), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991).

and even "placed a representative on-site with the authority to promulgate rules governing all operations at the site and to remove workers who were incompetent or guilty of misconduct." *Id.*

Pursuant to Third Circuit precedent, the court applied the "actual control" test to determine whether the United States was an operator of American Viscose's facility. *Id.* at 843. "Under this test, a corporation will be liable for the environmental violations of another corporation if there is evidence that it exercised 'substantial control' over the other corporation. At a minimum, substantial control requires 'active involvement in the activities' of the other corporation." *Id.* (citation omitted). Apparently, the court concluded that "substantial control" is similar to the "day-to-day control" standard applied by other courts. *Id.* at 844.

The court concluded:

The government exerted considerable day-to-day control over American Viscose, and at the risk of being repetitious, we will explain why. In the first place, American Viscose would not have been making high tenacity rayon if not at the government's direction. To obtain the commercial product it needed, the government diverted American Viscose from its previous commercial endeavors. Thus, every day American Viscose did what the government ordered it to do. Second, although the government officials and employees personally did not take over the plant, the government maintained a significant degree of control over the production process through regulations, on-site inspectors, and the possibility of seizure. Third, the government built or had built plants supplying raw materials to American Viscose, controlled these plants, arranged for an increased labor force, and supervised employee conduct, at least to the extent of helping American Viscose deal with labor disputes and worker absenteeism. Fourth, the government supplied machinery and equipment for use in the manufacturing process. Fifth, the government controlled product marketing and price. Given this degree of control, and given the fact that the wastes would not have been created if

not for the government's activities, the government is liable as an operator.

*Id.*

### Vertac Chem. Corp.

The second case is *United States v. Vertac Chem. Corp.*, 46 F.3d 803 (8th Cir.1995). *Vertac* involves the production of Agent Orange during the Vietnam Conflict. In response to a solicitation by the United States, Hercules, Inc. ("Hercules") submitted a bid and was awarded a contract with the Department of Defense ("DOD") to produce Agent Orange. *Id.* at 806. "While DOD allowed Hercules limited opportunities to negotiate and modify the terms of the contract specifications, the specifications remained substantially dictated by DOD." *Id.*

Unlike in FMC, "[n]one of the raw materials used by Hercules for the production of Agent Orange was ever owned or directly supplied by the United States." *Id.* The United States did, however, issue directives to the supplier of one raw material to ensure that it would supply the material to Hercules. *Id.*

The United States did not own any of the equipment or machinery used by Hercules to produce Agent Orange, and, in fact, "Hercules protected certain aspects of its Agent Orange production process [from the DOD] as proprietary information." *Id.* Moreover, the United States never participated in the management of Hercules' personnel. *Id.*

After a lengthy discussion of FMC, the court noted that, unlike American Viscose, "Hercules elected to bid for the Agent Orange government contracts. To the extent Hercules had to change its operations to produce Agent Orange, as opposed to other herbicides ..., those changes resulted from its own decision to seek the government's wartime business." *Id.* at 809. The court further noted that, again unlike American Viscose, the DOD did not participate in the management of Hercules's employees. *Id.* Accordingly, the court concluded that "the United States was not sufficiently involved, directly or indirectly, in the activities that took place at the ... facility to constitute actual or substantial control" and, therefore,

that the United States could not be held liable as an operator of the facility. *Id.*

*The Present Case*

■ The United States' involvement in the present case falls somewhere in between its involvement in *FMC* and *Vertac.* In the present case, on the one hand, several facts indicate a heightened level of government involvement. First, K–F borrowed significant amounts of money from the United States and, as a condition to K–F SC's receiving the $25,000,000 loan in December 1950, the RFC required K–F to make diligent efforts to obtain defense contracts. That loan also increased K–F's incentive to bid on defense contracts by limiting its production of automobiles. However, K–F's borrowing of money from the United States has little bearing on the question whether the United States exerted substantial control over KMC—indeed, no more, in and of itself, than K–F's borrowing from Bank of America indicates that Bank of America exerted control over KMC. Second, the United States provided much of the equipment and machinery which KMC needed to produce the engines, and reimbursed KMC for that equipment which it had to purchase.[8] Third, the Air Force had many representatives at the Dowagiac plant while the government-owned equipment was being installed, and retained one representative, who had an office at the plant, during KMC's performance of the contract. Fourth, while KMC determined whether or not its employees would work overtime, the Air Force determined whether they would be compensated for this overtime.[9]

On the other hand, several facts indicate a lack of substantial control by the United States over KMC's production of R–1300 engine. First, the United States did not "twist K–F's arm", forcing it to produce R–1300 engines; rather, K–F sought out such work. In his deposition, Eugene E. Trefethen, Jr.,

who was deeply involved with K–F's relationship with the RFC and who eventually became President of Kaiser Industries, stated:

> We were interested ourselves and they [the RFC] were interested in the concept, too, that we could—to the extent practical[—]and we would obtain some defense contract work, which was something that we were very interested in anyway.
>
> *      *      *      *      *      *
>
> So it was our desire, to the extent that it made sense where we had the people, the know-how, the facilities, to do defense work, why, we were very anxious to do that.

Dep. of Eugene E. Trefethen, Jr., Chrysler's Mot. for Partial Summ. J., Exh. C, at 44, 47.

Second, the Court finds no evidence that the Air Force impinged at all on KMC's management of its operations. On the contrary, the evidence indicates that management decisions were made exclusively by KMC. For instance, James F. McCloud, the General Manager of KMC, stated in his deposition that the Air Force did not supervise his decisions and that he did not report to the Air Force on a day-to-day basis. Rather, he reported only "[a]nything of any nature that impinged upon our compliance with that contract." Dep. of James F. McCloud, United States' Cross–Mot. for Summ. J., Exh. 6, at 131. Moreover, that the United States had no involvement in the management decisions of KMC is further evidenced by a document from the Secretary of the Air Force concerning the Air Force's cancellation of its C–119 contract with the KMC:

> Other factors having to do with management and union problems in the Kaiser–Frazer plant have been advanced as reasons for the cancellation of the Kaiser–Frazer contracts. While these may be serious problems, *they are not our Problems.* The Air Force is the buyer. We are inter-

---

8. To place particular significance to this fact, however, is remiss. The existence of a lender/borrower or lessor/lessee relationship with regard to equipment says little, if anything, about who is *operating* a facility. This relationship, however, may be significant with regard to owner liability, a question addressed in Part IV of this opinion.

9. This is not a surprising fact since the contract was a fixed-price *redeterminable* supply contract, the significance of this being that increased production costs for labor would probably have resulted in an upward adjustment in the fixed price of the aircraft.

ested only in a manufacturer meeting the terms of his contract in price and in time of delivery. That is our responsibility. We are not citiizing [sic] labor or management. We are basing our decision on results.

United States' Cross–Mot. for Summ. J., Exh. 29 (emphasis added).

Third, there is no indication that the United States involved itself in the manner of KMC's production of the R–1300 engine, except inasmuch as the specifications mandated specific production methods. This point is illustrated by the great disparity between the average unit price and tardy delivery of KMC's C–119 aircraft as compared with that of Fairchild and by the fact that KMC produced the R–1300 engines at a lower price than did Wright. With regard to the R–1300 contract specifically, that the Air Force's defense contractors controlled their method of production is further evidenced by an interoffice correspondence from C.A. Silcott, K-F's Engine Division's General Manager. The correspondence indicates that he was "unofficially" told by an Air Force official that KMC was the Air Force's "second best Air Force engine contractor nationally." He further indicated that this rating was "based on two principal factors, which are, quality and performance against schedule." United States' Cross–Mot. for Summ. J., Exh. 22. Both KMC's poor performance on the C–119 aircraft and its excellent performance on the R–1300 engines clearly indicate that these defense contractors generally, and KMC specifically, chose for themselves the manner in which the aircraft would be produced and had a great deal of control over the quality of their own manner of production. Furthermore, the mere presence of an Air Force representative at the Dowagiac plant does not indicate that the Air Force interfered with the manner of KMC's production of the engines since this representative merely monitored the quality control of the engines to ensure that they satisfied the contract specifications. See Decl. of George E. Yager, United States' Cross–Mot. for Summ. J., Exh. 1, ¶ 7; Dep. of David Page, United States' Cross–Mot. for Summ. J., Exh. 7, at 48–49; Dep. of Harold Gordon, Chrysler's Mot. for Partial Summ. J., Exh. C, at 134 ("The Air Force didn't have anything to do as far as actual operation; they just observed what was done and see if you conformed to the—in other words, the QC methods or requirements. But as far as say do this or do that or why did you do it, that wasn't their job, really.").[10]

Fourth, the evidence indicates that KMC's own procurement department purchased supplies ancillary to the production of the engines—that is, supplies necessary to maintain the plant—including such items as plating materials, tank liquids, and acids and cleaning materials. Dep. of James F. McCloud, United States' Cross–Mot. for Summ. J., Exh. 6, at 126–27. Similarly, KMC itself procured component parts for the R–1300 engines, id. at 127–28, and KMC itself decided from whom it would obtain these parts and worked out the scheduling for their delivery to KMC. See United States' Cross–Mot. for Summ. J., Exhs. 23 and 40.

Considering all of these facts together, it is clear that the Air Force did not exercise substantial control over, or actively involve itself in, the activities of KMC. For this reason, the Court will deny Chrysler's and Rospatch's motions for summary judgment, and will grant the United States' cross-motion for summary judgment, with regard to the United States' liability as an operator of the Dowagiac plant.[11]

10. Chrysler and Rospatch make much of the deposition testimony of several witnesses who indicated that the Air Force had the power to "shut down" KMC's production of the R–1300 engines if it was dissatisfied with quality of the engines being made. It seems that this is a necessary aspect of one's monitoring of quality control and does not evidence control over the manner of production. Cf. United States v. Taylor, No. 1:90–CV–851, 1993 WL 760996, at *18, 1993 U.S. Dist. LEXIS 19082, at *51 (Dec. 9, 1993) ("There is no evidence that the Army ever, in any sense, attempted to control the daily operations of Morweld. The Army has apparently stopped production on at least one occasion, however, but this was due to the inadequate quality of the products being made.").

11. While the Court has applied the actual control test, it would reach the same result under the authority to control test applied by a minority of the courts. In the present case, there is little evidence that the United States had more authority to control KMC's actions than the unsubstan-

## IV

Chrysler and Rospatch also contend that the United States is subject to CERCLA liability with regard to KMC's war-time activities as a past owner of either the Dowagiac plant or of particular equipment at the plant.

## A

The Court begins by considering Chrysler's and Rospatch's assertion that the United States is subject to CERCLA liability as an owner of certain equipment at the Dowagiac plant, particularly the plating equipment.[12] They contend that the plating system produced hazardous wastes in the form of cyanide, copper, lead, silver, chromium (hexavalent), and cadmium which was piped to a waste lagoon and thereby released into the environment. In its motion, on the other hand, the United States asserts that it is entitled to summary judgment on this issue.

At least one court has held the United States liable as an owner of equipment under a set of facts similar to the facts alleged by Chrysler and Rospatch. *See Elf Atochem N.A., Inc. v. United States*, 868 F.Supp. 707 (E.D.Pa.1994). In that case, Elf Atochem's predecessor-in-interest leased equipment from the United States, which equipment was necessary to produce DDT for use during World War II. *Id.* at 708. The court concluded that the United States was liable as an owner under CERCLA because it found that "the United States owned facilities (the equipment) that disposed of hazardous waste that was released into the environment and caused the incurrence of response costs." *Id.* at 712–13.

■ In the present case, however, the Court is reluctant to decide this issue at the present time for two reasons. First, there is a genuine issue regarding whether the Unit-

ed States owned all of the plating equipment from which releases may have occurred. It appears clear that the United States owned the vast majority of this equipment. *See, e.g.,* Dep. of David Page, Chrysler's Mot. for Partial Summ. J., Exh. D, at 45–46, 59; Dep. of James F. McCloud, Chrysler's Mot. for Partial Summ. J., Exh. G, at 26; Rospatch's Opposition to United States' Cross–Mot. for Summ. J., Exh. D, Attach. 3 (list of "Remaining stocklisted facilities" at the Dowagiac plant which includes 22 Udylite Tanks and 11 Mallory Rectifiers); Rospatch's Concurrence in Partial Mot. for Summ. J., Exh. 13 ("Existing plating disposal system is Government Owned (Not ASPR).""). K–F's contract administrator, Noel Kitchen, testified that KMC purchased the plating equipment and was reimbursed by the United States pursuant to the facilities contract. Dep. of Noel Kitchen, Chrysler's Mot. for Partial Summ. J., Exh. H, at 96–97. The Court presumes that this was the equipment sold to the plating company in Chicago.

Nevertheless, it is unclear to the Court precisely how KMC disposed of wastes from the plating system. It appears that waste was piped to one or more tanks in the basement of the plant beneath the plating department, where it was treated and released into the Dowagiac city sewer system, and that only excess amounts were spilled over into the waste lagoon outside. That this may be correct, and that a tank(s) in the basement of the plant may have been owned by KMC is evidenced by the brochure which KMC prepared for prospective buyers of the Dowagiac plant, which states at page 15: "Industrial waste from our plating operations are treated in our own waste disposal plant and reduced to a state recommended concentration prior to being dumped into the city sewerage system." [13]

---

tial control which it actually exercised. What little evidence exists, if any, is considered infra in Part IV.B of this opinion.

**12.** CERCLA defines the term "facility" to mean "any building, structure, installation, *equipment,* pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, lagoon...." 42 U.S.C. § 9601(9) (emphasis added).

**13.** Page 15 of this brochure was not attached to the motions of any of the parties, but rather was presented to the Court by the United States at the time of the oral argument in this matter. It is part of the same brochure as Exhibit 13 of Rospatch's Concurrence in Partial Motion for Summary Judgment, which the Court cited above.

The other reason that the Court is reluctant to decide this issue at the present time is that, even presuming the relevant plating equipment was owned by the United States, Chrysler and Rospatch have not set forth adequate evidence supporting their assertion that hazardous substances were released from the plating equipment, and that this release caused Rospatch to incur clean up costs.

## B

Finally, the Court considers Chrysler's and Rospatch's assertion that the United States was, for the purpose of CERCLA liability, an owner of the Dowagiac plant during the years of 1951–54, as a result of its lending relationship with K–F. The United States asserts that it is entitled to summary judgment on this issue inasmuch as it falls within CERCLA's secured creditor exemption.

The secured creditor exemption provides: "[The term 'owner or operator'] does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A). In the present case, the United States' indicia of ownership of KMC were the mortgage it held on KMC's building and equipment and the fact that it was the pledgee, with voting rights, of KMC's stock. It is clear that the United States held these interests primarily to protect its interest as the lender of $44,-400,000 to K–F and K–F SC in November 1949. Thus, the Court must determine whether the United States participated in the management of the Dowagiac plant such that it loses the protection of the secured creditor exemption.

Precisely what Congress meant by the phrase "participating in the management of a vessel or facility" is unclear. One early CERCLA case concluded that the phrase referred to the day-to-day management of the facility, and that a secured creditor is therefore protected by this exemption so long as its participation in the affairs of a facility was "limited to participation in financial decisions." *See United States v. Mirabile,* 15 Envtl. L. Rep. 20,992, 20,994, 1985 WL 97

(E.D.Pa. Sept.4, 1985). This approach has been accepted by the courts which have addressed this issue with the exception of the Eleventh Circuit Court of Appeals in *United States v. Fleet Factors Corp.,* 901 F.2d 1550 (11th Cir.1990). In *Fleet Factors,* that court noted that "participating in the management" must require less than day-to-day management since such day-to-day management would subject the lender to operator liability under the control test. *Id.* at 1557. The court concluded that "a secured creditor may incur section 9607(a)(2) liability, without being an operator, by participating in the financial management of a facility to a degree indicating a capacity to influence the corporation's treatment of hazardous wastes." *Id.*

■ As was the situation in the case of *In re Bergsoe Metal Corp.,* 910 F.2d 668 (9th Cir.1990), however, the Court in the present need not decide which of these approaches is the better approach, since the United States did not actually participate in the management of KMC at all. That is, the United States participated in neither the operational nor the financial management of KMC. *Cf. id.* at 672 ("It is clear from the statute that, whatever the precise meaning parameters of 'participation,' there must be some actual management of the facility before a secured creditor will fall outside the exception. Here there was none, and we therefore need not engage in line drawing.").

Chrysler and Rospatch point to at least nine facts which, they assert, indicate that the United States actively participated in the management of KMC. Two of these facts—that the Air Force controlled KMC's delivery schedule of the R–1300 engines, and that it indirectly controlled KMC's payment of overtime to its employees—involve nothing more than any vendee would or could demand from its vendor. Similarly, the Air Force's approving of K–F's assignment of the R–1300 contract to KMC evidences had no more involvement with KMC than would a vendee whose contract with its vendor was subject by an assignment or novation. These facts in no manner suggest that the United States was thereby participating in the management of KMC.

Several other facts—that the Air Force placed personnel at the Dowagiac plant, that it prepared or approved procedural manuals, and that it had authority to stop KMC's production of engines if dissatisfied with the quality of them—involve nothing more than the United States' interest in assuring the quality of the engines which KMC produced. Again, these facts demonstrate no more involvement with KMC than would be expected from any vendee, and are not indicative of participation in the management of KMC. Similarly, that the United States may have assisted KMC in acquiring materials which were in short supply, such as electrical equipment and steel, does not support a finding that it participated in KMC's management.

Chrysler and Rospatch also point to the fact that the RFC, as pledgee, with voting rights, of KMC's stock appointed Alan E. Schwartz to K–F's board of directors. Notably, Mr. Schwartz sat on the board of K–F, rather than KMC. His power to influence KMC, therefore, was too remote for the Court to conclude that the United States participated in the management of KMC through Mr. Schwartz. Moreover, while Mr. Schwartz was present at board meetings, he apparently never took "part in the official functions of the board." Dep. of Eugene E. Trefethen, Jr., United States' Cross–Mot. for Summ. J., Exh. 5, at 41.

The closer question arises with regard to Chrysler's and Rospatch's assertion that the RFC's electing of KMC's directors, through its proxy, Mr. Schwartz, indicates that the United States participated in the management of KMC. But again, the Court finds that the United States did not participate in KMC's management thereby. The individuals elected by Mr. Schwartz apparently were all associated with K–F. Had Mr. Schwartz elected himself or other government designees to the KMC board, Chrysler's and Rospatch's argument would present a stronger scenario, but there is no reason to suspect that the United States had or sought control over the KMC board members. Furthermore, the decisions which would constitute "management" of KMC would presumably be made by its officers and managers, rather than by its board of directors.[14] The United States had no involvement at this level of KMC's activities. Again, the United States' involvement with KMC's board of directors was too tenuous to support a reasonable conclusion that the United States participated in KMC's management.

## V

In summary, the Court concludes that the United States did not operate the Dowagiac facility during the years of 1951–54, and may not, therefore, be held liable as a past operator of that plant. Furthermore, the United States did not have involvement in the management of that plant, and is, therefore, protected from liability as a past owner of the plant as the result of its lending relationship with K–F and its subsidiaries. However, the Court reserves its judgment regarding whether the United States may be held liable as an owner of certain plating equipment.

An order consistent with this opinion will be entered.

### ORDER

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED AND ADJUDGED** that Defendant Chrysler Corporation's motion for partial summary judgment (docket # 51) is **DENIED.**

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiff's motion for partial summary judgment (docket # 57) is **DENIED.**

**IT IS FURTHER ORDERED AND ADJUDGED** that the motion for summary judgment of the "United States" defendants (docket # 75) is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED AND ADJUDGED** that **PARTIAL JUDGMENT** be entered for the "United States" defendants on the issues of liability as a past operator of

14. Webster's Dictionary defines "management" as "the executive function of planning, organizing, coordinating, directing, controlling, and supervising any industrial or business project or activity with responsibility for results".

the Dowagiac plant, and of the secured creditor exemption of 42 U.S.C. § 9601(20)(A).