OPINION OF THE COURT
John P. DiBlasi, J.
On Christmas Eve 1974 plaintiff Alyssa Pfleging was born. Tragically, she entered this world with congenital limb deformities, that is, without limbs below her elbows and knees. Years later, believing that her birth defects were caused by his exposure to the chemicals used at his place of work, her father, plaintiff William Pfleging, and she joined with other current and former employees of defendant International Business Machines Corporation (IBM) and their children in commencing litigation against IBM and numerous chemical manufacturers and distributors (the supplier defendants) which sold IBM chemicals used in the manufacture of computer microchips.
Because their claims have been determined to be time-barred by the governing New York State statute of limitations, Ms. Pfleging and her father (together hereinafter plaintiffs) move this court for leave to amend the complaints filed by them in the semiconductor litigation pending before this court involving approximately 190 other plaintiffs, so as to obtain the benefit of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 USC § 9601 et seq. [hereinafter CERCLA]), as amended by the Superfund Amendments and Reauthorization Act of 1986 (Pub L 99-499, tit I, § 101, 100 US Stat 1613 [hereinafter SARA]), and specifically, 42 USC § 9658, “which preempts the accrual date for state law toxic tort actions based on exposure to hazardous substances released into the environment by facilities as defined by CERCLA, [and] permit [s] such claims to accrue upon the discovery of the cause of the injury” (In re Pfohl Bros. Landfill Litig., 26 F Supp 2d 512, 517 [WD NY 1998]). In this case presenting an issue of first impression for this state’s courts, notwithstanding this court’s sympathy for plaintiffs’ plight, because their claims do not come within the scope of the relevant CERCLA provisions, their motion for leave to amend is denied.
*352 I. Relevant Factual Background.
Mr. Pfleging was employed by IBM at its East Fishkill, New York, facility (the New York plant) from July 1973 until 1976. During that period he worked in various capacities, some of which related to IBM’s manufacturing of semiconductor chips. The process of manufacturing those chips, which was and continues to be done in certain areas known as “clean rooms,” exposed Mr. Pfleging to a variety of chemicals manufactured and sold to IBM by certain supplier defendants.[1]
Mr. Pfleging and Ms. Pfleging have asserted claims in two of the currently pending 22 complaints, theirs being included in the actions filed under the captions Zachary David Ruffing et al. v Union Carbide Corp. et al. (Ruffing I) and Zachary David Ruffing et al. v Hoechst Celanese a/k/a American Hoechst et al. (Ruffing II),[2] which were commenced on August 13, 1996 and October 2, 1997, respectively.[3] These cases and related ones were the subject of certain preliminary motion practice before other Supreme Court Justices resulting in rulings which included one designating the case of Zachary Ruffing (the Ruffing case) as the first to go through full pretrial discovery and trial. Sometime thereafter, all of these actions were assigned to this court. Ultimately, the Ruffing case was resolved, and this court designated the next eight cases which would be tried (the *353 fast-track cases). As the fast-track cases have progressed through the discovery stage, both sides of the litigation have moved for various forms of relief.
Among the motions made by IBM and the supplier defendants (together hereinafter defendants) was one seeking summary judgment dismissing plaintiffs’ claims filed in Ruffing I and Ruffing II on the ground that they were untimely asserted. In opposition to that motion plaintiffs argued that they had set forth claims under CERCLA, thereby entitling them to the benefit of the more favorable accrual date which would render their claims timely. Then, in response to defendants’ reply papers, in which they argued that workplace exposures are not covered by CERCLA, plaintiffs submitted a letter in which they contended that if their specific factual claims did not bring them within the scope of CERCLA, they were nevertheless entitled to rely upon that statute because of their use of general language to the effect that Mr. Pfleging was exposed to chemicals in the clean rooms “and elsewhere.”
Because that letter constituted an unauthorized sur-reply it was not considered by the court, which rendered a decision and order entered June 27, 2001 granting summary judgment to defendants dismissing plaintiffs’ claims (the June 2001 decision). In a footnote the court observed that it was not addressing the issue of whether plaintiffs may amend their complaints to assert claims under CERCLA, and that “[plaintiffs’ entitlement to that relief would depend, of course, upon their ability to satisfy the requirements of a motion for leave to amend” (Templeton affirmation, exhibit A, decision and order, at 2).[4]
Thereafter, plaintiffs moved to amend their complaints to assert claims under CERCLA or, in the alternative, for leave to reargue the earlier summary judgment motion. In support of their motion they submitted only the affirmation of an attorney. Faced with defendants’ position that the attorney affirmation was insufficient to warrant the amendment sought by them, plaintiffs submitted an affidavit from Mr. Pfleging with their reply papers. This court refused to consider that affidavit, as its submission in reply papers deprived defendants of the opportunity to challenge its sufficiency. Consequently, the court *354 denied the motion in all respects in a decision and order entered November 27, 2001 (the November 2001 decision).
In a third effort to give continued viability to their claims, plaintiffs again move for leave to amend their complaints to set forth factual allegations that will permit them to rely upon the extended accrual date established by CERCLA.[5] In support of this motion, plaintiffs have offered their own affidavits, together with those of certain former IBM employees, a transcript of a deposition of another IBM employee, and an affidavit previously submitted by an expert witness in the Ruffing case. Those affidavits and the transcript present evidence that while Mr. Pfleging was employed at the New York plant, he was exposed to hazardous chemicals not just in the course of his work, but as a result of accidental spills and leaks inside and outside the plant, and intentional discharges of chemicals into the grounds surrounding the plant, the latter of which allegedly resulted in the contamination of the water used for drinking and washing by IBM employees. In sum, plaintiffs’ submissions are intended to demonstrate that there is merit to their claim that Ms. Pfleging was injured as a result of her exposures to chemicals brought into the Pflegings’ home on Mr. Pfleging’s clothing and on and inside his body, and passed to Ms. Pfleging in útero.
II. Discussion
As plaintiffs correctly assert, absent a showing of prejudice, leave to amend a pleading should be freely given (CPLR 3025 [b]; see, Edenwald Contr. Co. v City of New York, 60 NY2d 957, 959 [1983]). That general rule notwithstanding, “leave to amend is not to be granted upon the mere request of a party without a proper basis” (Morgan v Prospect Park Assoc. Holdings, 251 AD2d 306 [2d Dept 1998]). Consequently, “it is incumbent upon the movant to make ‘some evidentiary showing that the claim can be supported’ ” (ibid, [citation omitted]). It is then the motion court’s obligation to “examine the underlying merit of the proposed claims, since to do otherwise would be wasteful of judicial resources” (ibid.).
In opposing this motion, defendants do not argue that the granting of leave to amend will prejudice them in any manner. Rather, their central argument is that “[p]laintiffs have failed to establish that their proposed amendment has merit” *355 (defendants’ mem at l).[6] Because the determination of whether plaintiffs have made the requisite showing of merit turns upon the application of the controlling CPLR and CERCLA provisions, the starting point for the court’s decision is the relevant statutory language.
A. New York Statute of Limitations
In New York a cause of action for personal injury must be commenced within three years of the tortious conduct (CPLR 214 [5]). Previously, claims for personal injuries resulting from exposure to harmful substances were subject to the same three-year statute of limitations, and accrued as of the date of the injury (see, Matter of Steinhardt v Johns-Manville Corp., 54 NY2d 1008, 1010 [1981], amended 55 NY2d 802 [1981], appeal dismissed, cert denied 456 US 967 [1982]). Since the enactment of CPLR 214-c in 1986, where it is claimed that an injury has been “caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body,” that three-year period “shall be computed from the date of discovery of the injury by the plaintiff or the date when through the exercise of reasonable diligence such injury should *356 have been discovered by the plaintiff, whichever is earlier” (CPLR 214-c [2] [emphasis supplied]).
In recognition of the difficulty often encountered in determining the cause of an injury because of the absence of scientific knowledge, CPLR 214-c offers plaintiffs an alternative limitations period. Specifically, it provides that:
“Notwithstanding the provisions of subdivisions two and three of this section, where the discovery of the cause of the injury is alleged to have occurred less than five years after discovery of the injury or when with reasonable diligence such injury should have been discovered, whichever is earlier, an action may be commenced or a claim filed within one year of such discovery of the cause of the injury, provided, however, if any such action is commenced or claim filed after the period in which it would otherwise have been authorized pursuant to subdivision two or three of this section the plaintiff or claimant shall be required to allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the period within which the action or claim would, have been authorized and that he has otherwise satisfied the requirements of subdivisions two and three of this section.” (CPLR 214-c [4] [emphasis supplied].)
As is evident, section 214-c (4) establishes a “discovery of the cause of injury” commencement date for toxic tort claims, with a one-year period of limitations measured from the discovery of the cause, which is available as long as no more than five years have passed from the discovery of the injury, and on the further condition that plaintiff both pleads and proves that the state of scientific and medical knowledge was such that the cause could not have been discovered within the ordinarily applicable limitations period.
Notably, the discovery of the cause accrual date of section 214-c (4) applies to tortious conduct occurring before, on or after the July 1, 1986 effective date of section 214-c, except for an act, omission or failure:
“(a) which occurred prior to July first, nineteen hundred eighty-six; and
“(b) which caused or contributed to an injury that either was discovered or through the exercise of *357 reasonable diligence should have been discovered prior to such date; and
“(c) an action [ ] which was or would have been barred because the applicable period of limitation had expired prior to such date.” (CPLR 214-c [6].)
As is not disputed, plaintiffs’ claims, asserted for the first time in August 1996, more than 21 years after Ms. Pfleging’s injuries were discovered, are time-barred, even as tolled during her infancy by CPLR 208, if this state’s statute of limitations applies in their case.[7] It is for that reason that plaintiffs seek the benefit of the commencement date provided by CERCLA.
B. Federally Required Commencement Date
The result of congressional compromise and often criticized as being less than the model of legislative drafting (see, e.g., United States v Mottolo, 605 F Supp 898, 902 [D NH 1985] [“CERCLA has acquired a well-deserved notoriety for vaguely-drafted provisions and an indefinite, if not contradictory, legislative history”]; see also, United States v Wade, 577 F Supp 1326, 1331 [ED Pa 1983] [CERCLA “leaves much to be desired from a syntactical standpoint, perhaps a reflection of the hasty compromises which were reached as the bill was pushed through Congress just before the close of its 96th Session”]), CERCLA was enacted in response to this nation’s “well-publicized toxic waste problem” (see, United States v Wade, supra, 577 F Supp at 1330). What is clear about CERCLA is that it was intended to ensure “that the federal government be immediately given the tools necessary for a prompt and effective response to problems of national magnitude resulting from hazardous waste disposal” and “that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created” (see, United States v Reilly Tar & Chem. Corp., 546 F Supp 1100, 1112 [D Minn 1982]).
CERCLA’s reach did not stop with these stated goals. Thus, one of its sections directed that a study be conducted to determine, inter alia, “the nature, adequacy, and availability of existing remedies under present law in compensating for harm to man from the release of hazardous substances” (42 USC *358 § 9651 [e] [3] [A]) and the “barriers to recovery posed by existing statutes of limitations” (42 USC § 9651 [e] [3] [F]). One consequence of that study was the inclusion in SARA of 42 USC § 9658 (a) (l),[8] the provision at issue in this case, which states that:
“In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.” (Emphasis supplied.)
As noted above, this provision “preempt [s] the accrual date for state law toxic tort actions based on exposure to hazardous substances released into the environment by facilities as defined by CERCLA” (In re Pfohl Bros. Landfill Litig., 68 F Supp 2d 236, 242 [WD NY 1999]). In place of the “trumped” state law accrual date, section 9658 (a) (1) substitutes the “federally required commencement date” (FRCD), defined as “the date the plaintiff knew (or reasonably should have known) that [his] personal injury or property damages * * * were caused or contributed to by the hazardous substance or pollutant or contaminant concerned” (42 USC § 9658 [b] [4] [A]).
As is clear, section 9658 (a) (1) applies only if there has been a “release” into the “environment” from a “facility.” Insofar as relevant, the term “release” means:
“any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such *359 persons.” (42 USC § 9601 [22] [emphasis supplied].)
Also broadly defined is the term “environment” which, to the extent relevant, means:
“(A) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States * * * and (B) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States.” (42 USC § 9601 [8]).
Finally, as relates to the issues involved at bar, the term “facility” means:
“(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.” (42 USC § 9601 [9].)
Notwithstanding the obvious impact of section 9658 (a) (1) upon the accrual date for a state law cause of action arising from a toxic discharge into the environment, the statute is not without limitations. Thus, as has been recognized, it “creates neither a separate federal cause of action based on toxic torts within its terms nor a uniform statute of limitations related to such torts, but rather provides a uniform accrual date from which the applicable state period of limitations governing such tort actions is measured” (In re Pfohl Bros. Landfill Litig., supra, 26 F Supp 2d at 522). Nor does it replace in full any period of limitations created by statute or common law of any state, because “[e\xcept as provided in [section 9658 (a) (1)\, the statute of limitations established under State law shall apply in all actions brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility” (42 USC § 9658 [a] [2]). Finally, based upon the exception to the definition of “release,” section 9658 (a) (1) does not apply to workplace releases resulting in exposure to individuals, insofar as any claim which such individuals may assert against the employer (42 USC § 9601 [22]).
*360 C. Preemption of Section 214-c
On their faces, section 9658 (a) (1) and section 214-c (4) provide for identical accrual dates, i.e., the date of discovery of the cause of the plaintiffs injury. Despite that similarity, the two statutes are “inconsistent to the extent that [section] 214-c(4) permits the action only where the cause of the injury is discovered within the five years of the discovery of the injury” (see, In re Pfohl Bros. Landfill Litig., supra, 26 F Supp 2d at 531). Because section 214-c (4) limits the benefit of the discovery of the cause accrual date to cases where the plaintiff discovers the cause of his injuries no later than five years after discovering his injury, section 214-c (4) actually provides for an accrual date which is earlier than the FRCD, the latter of which applies without regard to the time that has passed since discovery of the injury (see, ibid.). Consequently, section 9658 (a) (1) preempts section 214-c (4) by “nullify[ing] [] the maximum five year period within which the statute of limitations under [section] 214-c (4) applies in a case” which is based upon a claim of injury caused by the release of a hazardous substance, pollutant or contaminant into the environment from a facility (ibid.).
Once the five-year limitation contained in section 214-c (4) is nullified, that section provides the identical accrual date as the FRCD (ibid.). Since 42 USC § 9658 (a) (2) specifically provides that section 9658 (a) (1) only preempts the accrual date for a cause of action, and that a state statute of limitations otherwise applies, “the FRCD’s preemptive effect does not displace the one year [limitations] period established by § 214-c (4)” (ibid.).
D. Release Into the Environment
In seeking leave to amend their complaints in Ruffing I and Ruffing II, plaintiffs rely upon two theories of exposure to hazardous substances “released into the environment” to entitle them to claim the benefit of the FRCD (42 USC § 9658 [a] [1]). First, they assert that while in útero Ms. Pfleging was exposed to certain hazardous chemicals used at the New York plant as a result of her mother’s handling and laundering of clothing worn by her father at work which became soiled by those chemicals due to spills and leaks within his workplace (the clothing exposure theory). Second, plaintiffs maintain that chemicals that had been spilled or otherwise discharged into the grounds around the New York plant leaked into the groundwater which served as a source of water for drinking and washing by IBM employees such as Mr. Pfleging, and that *361 Ms. Pfleging was exposed in útero to those chemicals when her parents engaged in unprotected sex during the postconception period (the bodily fluid transfer theory).
In opposing the application of the FRCD to plaintiffs’ proposed amendment, defendants contend that the definition of the term “environment” under CERCLA renders the two theories of exposure meritless, thereby requiring denial of the motion. To determine whether plaintiffs may resort to the FRCD to save their otherwise time-barred claims, the court must separately address the two theories proffered by them.
1. Clothing Exposure
Under plaintiffs’ clothing exposure theory, the original releases of hazardous chemicals occurred when, “at the end of each shift” of his work, Mr. Pfleging “return [ed] to [his] home wearing or carrying” the clothing that he wore to work, which became “so soaked and stained with these * * * chemicals [used at the New York plant] that [his] clothing would actually become wet and soaked through to [his] skin” (William Pfleging affidavit paras 14, 15). According to plaintiffs, “[n]umerous other courts have held [that] chemicals transported from a worksite, such as on clothing, are releases or threatened releases into the environment under CERCLA” (plaintiffs’ reply mem at 16). Relying upon those cases, plaintiffs contend that their claim that Ms. Pfleging was harmed in útero as a consequence of her mother’s contact with Mr. Pfleging’s contaminated clothing is meritorious, and that they should be permitted to assert that claim in amended complaints in Ruffing I and Ruffing II.
a. Workplace Exposures
With respect to the clothing exposure theory, defendants make two arguments. Their first is that any exposure to a hazardous material within the workplace does not constitute a “release into the environment” under section 9658 (a) (1). Plaintiffs counter with the contention that under the definition of a “release,” the exception for workplace exposures applies only to employees and solely with respect to claims that they may assert against their employers.
As set forth above, excluded from the application of section 9658 (a) (1) is “any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons” (42 USC § 9601 [22] [A] [emphasis supplied] [hereinafter the statu *362 tory workplace exception]). In plaintiffs’ view, “it does not matter that a portion of Mr. Pfleging’s chemical exposure was indoors during his work,” because “[hiere the in útero infant is the injured party, and she was not an employee of IBM” (plaintiffs’ reply mem at 15). .
Certainly, if an employee seeks to sue his employer for injuries sustained as a result of exposures to hazardous materials solely within the confines of his workplace, resort to the FRCD may not be had, because there would be no release into the environment under section 9658 (a) (1) (see, Covalt v Carey Canada Inc., 860 F2d 1434, 1439 [7th Cir 1988] [employee injured by exposure to asbestos used at his workplace does not receive benefit of FRCD because “(t)he interior of a place of employment is not ‘the environment’ for purposes of CER-CHA — at least to the extent employees are the injured persons”]). In this case, however, the injured plaintiff was not an IBM employee, but is the child of an IBM employee who was not injured. Consequently, if the employment status of the ultimately injured plaintiff was the determining factor for the existence of a release into the environment, the court would agree with plaintiffs that the statutory workplace exception has no relevance, and that barring other considerations, their proposed amendment has merit.
Contrary to plaintiffs’ position, the conclusion that exposures solely within the workplace do not support reliance upon the FRCD is not based merely upon the statutory workplace exception. Rather, as has been repeatedly recognized, that conclusion is supported by the meaning of the term “environment” as used in section 9658 (a) (1). Thus, notwithstanding that the term “environment” includes the “ambient air within the United States,” numerous courts considering section 9658 (a) (1) have determined that “the ‘environment’ referred to in the statute ‘includes the atmosphere, external to the building,’ but not the air within a building” (see, 3550 Stevens Cr. Assoc. v Barclays Bank of Cal., 915 F2d 1355, 1360 [9th Cir 1990], cert denied 500 US 917 [1991], quoting Prudential Ins. Co. of Am. v United States Gypsum, 711 F Supp 1244, 1255 n 3 [D NJ 1989] [emphasis supplied]; see also, Knox v AC & S, Inc., 690 F Supp 752, 757 [SD Ind 1988]; Electric Power Bd. of Chattanooga v Westinghouse Elec. Corp., 716 F Supp 1069, 1080-1081 [ED Tenn 1988], affd sub nom. Electric Power Bd. of Chattanooga v Monsanto Co., 879 F2d 1368 [6th Cir 1989], cert denied 493 US 1022 [1990]; Covalt v Carey Canada Inc., supra, 860 F2d at 1436 [“A place where work is being carried out is *363 not the ‘environment’ for purposes of the Superfund Act”]; Becton v Rhone-Poulenc, Inc., 706 So 2d 1134, 1141 [Ala 1997] [section 9658 (a) (1) does not apply to employee’s exposure to chemical used in his workplace in rayon manufacturing process]).
Consideration of the purpose of CERCLA in general further supports this view. As described by the Covalt court:
“The structure of CERCLA is what one would expect from the statement of purposes: the Act permits the Environmental Protection Agency to investigate sites it believes are contaminated with hazardous wastes and dangerous [sic]; it establishes a register of such places and the Superfund to pay for cleaning them up; it permits the government to direct the former owners and operators of the sites to cleanse them, or to do so itself and collect the costs from former operators without regard to fault. It does not regulate emissions from existing sources (the subject of the Clean Air and Clean Water Acts) or the levels of toxic substances permitted at work (the subject of the Occupational Safety and Health Act).” (Covalt v Carey Canada Inc., supra, 860 F2d at 1437 [emphasis supplied].)
Consistent with this view, it has been declared “that the scope of CERCLA is limited to the release of hazardous substances in ‘waste’ form only” (Electric Power Bd. of Chattanooga v Westinghouse Elec. Corp., supra, 716 F Supp at 1080), so that CERCLA does not apply so as to regulate workplace releases of hazardous substances as they are used in the business being conducted at the workplace (see, Knox v AC & S, Inc., supra, 690 F Supp at 757 [CERCLA’s emphasis “is on remedying the adverse consequences of improper disposal, improper transportation, spills, and improperly maintained or closed disposal sites”]; see also, Cyker v Four Seasons Hotels Ltd., 1991 WL 1401, *2, 1991 US Dist LEXIS 1310, *5 [D Mass 1991] [“Even a cursory reading of CERCLA reveals that its aim is to create a national law and remedy in response to the crisis created by the unlawful and unregulated disposal of hazardous wastes”]).
Of course, this court is aware that with the enactment of SARA, section 9658 (a) (1) was added to CERCLA. That provision was “[c]learly [] intended * * * to have impact beyond actions for recovery of expenses incurred in cleaning up toxic waste sites” and “[i]t applies by its terms to individual lawsuits for ‘personal injury, or property damages,’ not just ‘necessary *364 response costs’ ” (Rivas v Safety-Kleen Corp., 98 Cal App 4th 218, 236, 119 Cal Rptr 2d 503, 517 [2d Dist 2002]).
Notwithstanding the broader reach of section 9658 (a) (1), “SARA, the source of * * * [that section], does not change the focus or structure of CERCLA” (Covalt v Carey Canada Inc., supra, 860 F2d at 1437). Consequently, it is “[e]qually obvious * * * that section 9658 was never meant to extend to all state court lawsuits for personal injury and property damage arising from exposure to toxic substances” and that “[b]y retaining the requirements that the exposure result from ‘release’ into the ‘environment’ from a ‘facility’ as those terms are used for purposes of a CERCLA cost recovery action, Congress expressed its intent to limit the statute’s scope” (Rivas v Safety-Kleen Corp., supra, 98 Cal App 4th at 236, 119 Cal Rptr 2d at 517).
Among those limitations is that section 9658 (a) (1) is not intended to provide a remedy for injurious exposures to toxic substances used and released into the ambient air solely within the workplace (see, ibid. [“(A)n exposure limited to a few persons inside an enclosed space is not covered by either section 9658 or CERCLA in general”]; see also, Cyker v Four Seasons Hotels Ltd., supra, 1991 WL 1401, *2, 1991 US Dist LEXIS 1310, *5 [“CERCLA was not meant to provide a civil remedy whenever hazardous substances are found in a building’s interior”]; Knox v AC & S, Inc., supra, 690 F Supp at 757] [“Although ‘environment’ is defined in terms of ambient air, an evaluation of the term environment in terms of the overall purpose and scope of CERCLA indicates that the case at bar (involving an employee’s exposure to a hazardous substance in a workplace) is not properly considered within the purview of CERCLA and more specifically, the discovery statute of limitations established in § 9658”]; G.J. Leasing Co., Inc. v Union Elec. Co., 54 F3d 379, 385 [7th Cir 1995] [section 9658 (a) (1) does not apply to release of asbestos inside building, with no leak outside]; Electric Power Bd. of Chattanooga v Westinghouse Elec. Corp., supra, 716 F Supp at 1080 [dielectric fluid leak inside building was not release into environment “contemplated or intended” under CERCLA]). Because the “release” of chemicals upon which plaintiffs’ claims are based was solely that of chemicals used by Mr. Pfleging and other employees within his IBM work sites in the course of manufacturing semiconductor chips, plaintiffs may not resort to the FRCD to render their claims as timely asserted. For that reason alone, the proposed amendment lacks merit, at least with respect to the clothing exposure theory.
*365 b. Release by Clothing
In addition to arguing that plaintiffs are barred from relying upon section 9658 (a) (1) because the initial exposure to the alleged hazardous chemicals occurred solely within Mr. Pfleging’s workplace, defendants attack the merits of the proposed amendment by asserting that “[n] either * * * the mother’s alleged exposure inside the home during the laundering process, nor the fetus’ alleged exposure via the mother’s bloodstream, involve exposures to releases ‘into the environment’ ” (defendants’ mem at 18). Taking the opposite stance, plaintiffs maintain that “contaminated clothing, just like contaminated rags, drums, or gloves, may be the vehicle whereby hazardous substances are released into the environment” and that “case law demonstrates that contaminants on Mr. Pfleging’s clothing and exterior body leaving a facility, would fall within the CERCLA statute” (plaintiffs’ reply mem at 17). Resolution of this aspect of the parties’ dispute initially requires a parsing of the stages in the transfer of the chemicals from Mr. Pfleging’s work site to his then unborn child, which results into two possible scenarios.
i. Home as an “Environment”
In the first setting, the “release” is Mr. Pfleging’s exposure to the chemicals through his working with them within the clean rooms or other areas inside the New York plant. As discussed above, since these work site releases do not come within the scope of section 9658 (a) (1), the subsequent exposures suffered by his wife, and in turn, his child in útero, also fail to gain the benefit of the FRCD.
The alternative setting is one in which the release is deemed to be Mr. Pfleging’s transporting of the chemicals on his clothing and the exterior of his body to his home, where his wife was then exposed to them in handling the laundry, after which she transferred them to the unborn child. For there to be merit to plaintiffs’ proposed amendment to their complaints in Ruffing I and Ruffing II, the exposure in the Pflegings’ home must come within the meaning of a “release into the environment” under CERCLA.
As noted, the “environment” is defined as including the “ambient air” (42 USC § 9601 [8]).[9] Nonetheless, it is clear that enclosed areas, even those which are not work sites where haz *366 ardous substances are used, are not considered to be part of the environment for the purposes of section 9658 (a) (1).
For example, in Electric Power Bd. of Chattanooga v Westinghouse Elec. Corp. (supra, 716 F Supp 1069), an explosion in the penthouse vault atop a building occurred while an electrical maintenance crew was performing service work on a “network protector” used in the electrical system supplying power to the building. In the lawsuit involved therein, claims for property and related damages were challenged as being untimely under the applicable state statute of limitations. Seeking the benefit of the FRCD, plaintiff offered proof that toxic dielectric fluid containing polychlorinated biphenyls (PCBs) was leaked or released into the penthouse vault and later tracked about the penthouse area during efforts to extinguish the fire caused by the explosion. Upon consideration of the definition of “environment” as applied to section 9658 (a) (1), the court concluded that “the leaking of a relatively small quantity of dielectric fluid from a damaged transformer, within the confines of a penthouse containing electrical equipment, is [not] the type of ‘release into the environment’ contemplated or intended by [] CERCLA” (716 F Supp at 1081).
A similar conclusion was reached by the court in Cyker v Four Seasons Hotels Ltd. (supra, 1991 WL 1401, *2, 1991 US Dist LEXIS 1310, *6), where claims relying upon CERCLA were asserted by the owners of an apartment in a condominium against the developers, owners, and operators of the condominium. Plaintiffs therein alleged that for several years their apartment was contaminated by chemically polluted air which came from an adjacent indoor pool. Also looking to the meaning of the term “environment,” the Cyker court ruled that “[t]o define [that term] so as to encompass the interior of a hotel/condominium complex would stretch the statute far beyond the particular ills that Congress sought to remedy” (ibid.). Consequently, that court dismissed plaintiffs’ CERCLA private action claim for failure to state a cause of action, i.e., that it did not allege a release “into the environment” (ibid.).
Here, if the release is viewed as being the transporting of hazardous chemicals into his home on his clothing or the exterior of his body and the transfer of them, first to his wife, and then to his unborn child, through his wife’s contact with his clothing, then as in both Electric Power Bd. of Chattanooga *367 v Westinghouse Elec. Corp. and Cyker v Four Seasons Hotels Ltd., the release has occurred solely within an enclosed building. Because there was no release into the “ambient air” or any other air or water within the CERCLA definition of “environment,” that transfer of chemicals does not suffice for the purpose of invoking the benefit of the FRCD (see, Electric Power Bd. of Chattanooga v Westinghouse Elec. Corp., supra; see also, Cyker v Four Seasons Hotels Ltd., supra; cf., Knox v AC & S, Inc., supra; G.J. Leasing Co., Inc. v Union Elec. Co., supra).
In reaching this conclusion, this court is mindful of the cases cited by plaintiffs which have applied CERCLA to situations in which it was claimed that hazardous substances were, or could have been, transported on the clothing or bodies of individuals who were exposed to such substances. After reviewing the facts and claims involved in those cases, this court concludes that they are not persuasive authority as to the issues presented at bar.
ii. The CERCLA Clean-Up Cases
Plaintiffs first offer State of Vermont v Staco, Inc. (684 F Supp 822 [D Vt 1988], vacated in part 1989 WL 225428, 1989 US Dist LEXIS 17341 [D Vt 1989]), in support of their position. In Staco, the State of Vermont and one of its villages sued under CERCLA and a state waste management law to recover response costs incurred in the clean up and removal of mercury which allegedly contaminated the village’s sewage treatment facility, the connecting municipal sewer lines and certain privately owned septic systems, and which was leaking from a former mercury thermometer manufacturing plant. In concluding that plaintiffs were entitled to recover under, inter alia, 42 USC § 9607 (a), which permits private actions against responsible parties for remedial and removal costs caused by the release or threatened release of hazardous substances (hereinafter recovery action or clean-up action), the court relied upon the undisputed evidence that mercury had been released from the facility on the bodies and clothing of workers, and that there was a threat of release to the ground water as a result of the presence of mercury in some workers’ domestic septic systems that had the capability of leaching into the ground water.
Likewise, in Reading Co. v City of Philadelphia (823 F Supp 1218 [ED Pa 1993]), plaintiff sued under CERCLA and a state environmental law for contribution of defendants’ share of the *368 multimillion dollar clean-up costs paid by it, as well as future costs incurred, in removing PCBs from a viaduct which formerly bore tracks of the Reading Railroad to the Reading terminal train shed, the Reading terminal and connected areas, including the Reading terminal market (the market). Defendants argued, inter alia, that there was no threatened release into the environment as required under CERCLA. The Reading court rejected that claim, based upon the fact that PCBs had already migrated from the train shed floor into parts of the market ceiling, and “the possibility” that the 60,000 people present daily in the market and workers doing construction in a connected convention center could carry the PCBs on their clothing (id. at 1238).
Two other cases offered by plaintiffs are similar to those cited above. Thus, in BCW Assoc., Ltd. v Occidental Chem. Corp. (1988 WL 102641, 1988 US Dist LEXIS 11275 [ED Pa 1988]), clean-up costs were sought based upon claims arising from the accumulation of lead dust inside a warehouse during its prior use. There, the court found that “[t]he threat that the dust would be released via goods being shipped by [one of the plaintiffs] was a substantial factor in causing the plaintiffs to incur response costs” (1988 WL 102641, *17, 1988 US Dist LEXIS 11275, *47). So too, Seneca Meadows, Inc. v ECI Liquidating, Inc. (121 F Supp 2d 248 [WD NY 2000]) was a recovery action under CERCLA based upon a claim that defendants were responsible for contaminating a landfill and property adjacent to it which were owned by plaintiffs. In that case the court denied motions seeking summary judgment dismissing plaintiffs’ claims, finding that issues of fact existed including whether the disposal of refuse such as floor sweepings, rubber gloves, clothing and rags contaminated with a hazardous chemical would support the relief sought under CERCLA.
In plaintiffs’ view, these cases establish a rule that “chemicals transported from a worksite, such as on clothing, are releases or threatened releases into the environment under CERCLA” (plaintiffs’ reply mem at 16). By expressing the holdings of these decisions in this manner, plaintiffs have overstated their significance, at least with respect to their claims presented in this litigation.
In a CERCLA action to recover clean-up costs, “a plaintiff must prove the following elements: (1) the defendant comes within one of the four classes of ‘covered persons’ identified in § 9607(a)(2), (2) there is a release or threatened release of haz *369 ardous substances from a facility, (3) the release or threatened release caused the plaintiff to incur response costs, (4) the costs incurred were the necessary costs of response, and (5) the response costs incurred were consistent with the national contingency plan” (Reading Co. v City of Philadelphia, supra, 823 F Supp at 1227-1228; 42 USC § 9607 [a] [emphasis supplied]).[10] This contrasts with the burden imposed upon a plaintiff seeking the benefit of the FRCD in a personal injury action under state law. There, in addition to the elements of a state law cause of action that must be satisfied, the plaintiff must prove that the injury sued upon was “caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment” (42 USC § 9658 [a] [1]; cf., Electric Power Bd. of Chattanooga v Westinghouse Elec. Corp., supra, 716 F Supp at 1080 [plaintiff seeking award of expenses incurred in cleaning and testing inside building cannot rely on any release of PCBs outside building to come within CERCLA because there was no causal link between plaintiffs injury and any potential release outside confines of building]).
It is immediately evident that there is a significant difference in the temporal aspect of the environmental release that must be proven in the two types of cases. That is, in a recovery action under CERCLA, even if there has not been an actual release into the environment, relief may be obtained upon a mere threatened release, while in a personal injury action in which section 9658 (a) (1) is relied upon, only an actual release causing or contributing to the injury will suffice. [11]
Indeed, the significance of the “threatened release” alternative has been recognized by the court which rendered the deci *370 sions in two of plaintiffs’ cited cases, Reading Co. v City of Philadelphia and BCW Assoc., Ltd. v Occidental Chem. Corp. As observed by that court in Elf Atochem N. Am., Inc. v United States (868 F Supp 707 [ED Pa 1994]), when the term “release” is construed in a CERCLA recovery action, it “is to be construed broadly,” so that, as other courts have held, “there need only be an eventual release, not an actual or imminent one” (id. at 712, citing Amland Props. Corp. v Aluminum Co. of Am., 711 F Supp 784, 793 [D NJ 1989] [“(T)here is no requirement that an actual release have already occurred or be imminent; a threatened release, on its own, is sufficient under CERCLA”]). It is for that reason that any release of hazardous material into an area which leads into an element of the environment will support a recovery action (see, Elf Atochem N. Am., Inc. v United States, supra, 868 F Supp at 712 [disposal of waste into pipes that lead directly to the environment constitutes threatened release for purposes of recovery of clean-up costs]).[12]
In this case, no matter which theory of release is relied upon by plaintiffs, there is no allegation of any actual release into an element of the environment, whether the environment is viewed as the Pflegings’ home, the body of Mrs. Pfleging or the bloodstream of her or her unborn child.[13] Therefore, the transfer of chemicals from Mr. Pfleging to his wife from his clothing or the exterior of his body does not constitute a release into the *371 environment which would trigger the application of the FRCD to plaintiffs’ claims and render their proposed amendment meritorious.
iii. The Kowalski Case
In their motion papers, plaintiffs repeatedly cite the decision of the District Court in Kowalski v Goodyear Tire & Rubber Co. (841 F Supp 104 [WD NY 1994]) as persuasive authority on the issue of releases into the environment through the carrying of hazardous chemicals on the clothing of an employee. Although it appears that Kowalski is the only reported case presenting facts that are substantially similar to those involved in plaintiffs’ case, this court does not agree that Kowalski should be followed.
In Kowalski, plaintiffs sued defendant on claims of negligence and strict liability based upon their allegation that defendant failed to prevent the release of ortho-toluidine from its Niagara Falls plant, where it was used, which caused Mrs. Kowalski to develop bladder cancer after 20 years of exposure to that chemical. According to plaintiffs, the hazardous chemical was released from the plant each day when Mr. Kowalski left work, resulting in Mrs. Kowalski’s exposure to the chemical through her handling of her husband’s clothing and the spread of the chemical throughout their house and automobile.
Seeking to defeat defendant’s summary judgment motion based, in part, upon a timeliness challenge, plaintiffs sought refuge under section 9658 (a) (1). In response, defendant argued that the FRCD did not apply because there was no release into the environment as defined by CERCLA.
Viewing the “the manner of alleged release [as] the carrying-out of the substance from the plant upon the clothes and person of the plaintiff-husband,” the court addressed defendant’s argument that plaintiffs’ home and automobile, which the court considered to be the “environment,” did not constitute the “environment” as contemplated by CERCLA, as follows:
“Plaintiffs counter that such a narrow interpretation would violate the broad, remedial purpose of the statute. They cite State of Vermont v Staco, Inc., 684 F.Supp. 822, 834 (D.Vt.1988), which found that carrying home hazardous substances on clothing constitutes a ‘release into the environment’ for *372 the purposes of CERCLA analysis. This court agrees that the remedial purposes of the statute and the language concerning the release of chemicals into the environment can be read to include hazardous chemicals carried out of the workplace on employees’ person and clothing which have the potential of causing injuries to those who come in contact with such employees.” (Id. at 108.)
Relying upon this language, plaintiffs at bar assert that “even absent IBM’s dumping of chemical wastes in the vicinity of its plants, ** * * there would still have been a ‘release into the environment’ for the purposes of [their] [ ] cases” (plaintiffs’ reply mem at 22).
This court agrees with plaintiffs that Kowalski cannot be distinguished from their cases factually or legally. That does not mean that it is controlling in this case. As defendants correctly observe, the Kowalski court “did not * * * even begin to explain how either the purposes of Section [9658 (a) (1)] or its language could be read to convert a house into the ‘environment’, especially as that term has been defined in the statute” (defendants’ mem at 18). Nor did the Kowalski court address the different burden of proof applicable to a recovery action, as opposed to a personal injury suit invoking the benefit of the FRCD.[14]
As set forth above, upon this court’s analysis of the relevant CERCLA provisions and the case law construing the terms “release” and “environment,” neither plaintiffs’ home nor Mrs. Pfleging’s person constitute the “environment” within the intent of CERCLA in general and section 9658 (a) (1) in particular. Thus, this court respectfully disagrees with the conclusion reached by the court in Kowalski, as has the highest court of a sister state (see, Becton v Rhone-Poulenc, Inc., supra, 706 So 2d at 1140-1141 [“However, it appears that the Kowalski court and the Staco court ignored other jurisdictions’ interpretations of the kind of situations CERCLA was designed to remedy”]).
2. Bodily Fluid Transfer
As noted, plaintiffs’ second environmental release theory is that Mr. Pfleging was exposed, internally, to hazardous *373 chemicals, through his drinking and washing with water contaminated by those chemicals after they were dumped and otherwise discharged into the grounds around the New York plant, and leached into the water sources used by IBM for drinking and washing water for its employees, and that, in turn, Ms. Pfleging was exposed to the same chemicals through the unprotected sexual intercourse engaged in by her parents while she was in útero. Not surprisingly, defendants do not argue that IBM’s alleged discharges of hazardous chemicals into the grounds around its plant do not constitute “release [s] into the environment” under section 9658 (a) (1) (see, United States v Reilly Tar & Chem. Corp., supra, 546 F Supp at 1110 [CERCLA recovery claim sufficiently supported by allegation of spills, leaks and discharges of chemicals directly into ground which entered groundwater used as water supply for a park and surrounding area]). Instead, they attack this theory on the same ground as the clothing release theory, i.e., that “[i]f the initial alleged exposure to Mr. Pfleging occurs inside the workplace, and the subsequent alleged ‘release’ is to the mother’s body by means of sexual intercourse, and through her to the unborn child, there is no ‘release into the environment from a facility’ at any point during this hypothetical scenario” (defendants’ mem at 18).
In plaintiffs’ view, “given the broad reading of the CERCLA statute and the intended remedial effects of section [9658 (a) (1)], it makes no difference whether the hazardous substances that cause injury are transported from the facility on the outside (clothing, shoes, skin), or the inside of a person’s body” (plaintiffs’ reply mem at 17). Relying upon State of Vermont v Staco, Inc. (supra) and the general principle that remedial statutes should be broadly construed, plaintiffs contend that section 9658 (a) (1) applies to their bodily fluid transfer theory.
As addressed above, Staco is distinguishable because it involves a recovery action, in which a threatened release, even absent an actual release, supports relief. Although it may be inferred from the facts set forth in the Staco decision that the workers there were transporting mercury home from their workplace and through their urine were releasing it into their home septic systems, the factor that supported the recovery action was the potential that there would be a release of mercury from some workers’ domestic septic systems into the ground water in the area in which the homes were located, the latter which clearly constitutes the environment (42 USC § 9601 [8] [“Environment” includes “any * * * ground water”]). In the *374 case at bar, although plaintiffs allege that Mr. Pfleging was carrying home hazardous chemicals inside his body, there is no allegation of any actual release beyond that to his wife and unborn child within the confines of their home. Thus, Staco provides no support for plaintiffs’ bodily fluid release theory.[15]
Of course, it is certainly true that a statute which is “remedial in nature * * * should be liberally construed to spread its beneficial effects as widely as possible” (see, Post v 120 E. End Ave. Corp., 62 NY2d 19, 24 [1984]). This treatment has generally been afforded to the interpretation of CERCLA’s provisions, including its definition of a “release,” with courts recognizing that “CERCLA is essentially a remedial statute designed by Congress to protect and preserve public health and the environment” and that they “are therefore obligated to construe its provisions liberally to avoid frustration of the beneficial legislative purposes” (Dedham Water Co. v Cumberland Farms Dairy, Inc., 805 F2d 1074, 1081 [1st Cir 1986]; see also, Rhodes v County of Darlington, S.C., 833 F Supp 1163, 1178 [D SC 1992]).
Nevertheless, CERCLA should not be interpreted in a manner which fails to acknowledge its defined limits. As so aptly stated by the Seventh Circuit Court of Appeals:
“Section [9658(a)(1)] preempts state law only with respect to releases into the environment. The definition of ‘release[3] reiterates this limitation: only spilling, leaking, etc., ‘into the environment’ is a ‘release’. It is lexically possible to treat the ‘environment’ as everything pertaining to the planet Earth, so that the instant a container of asbestos is opened it is released ‘into [the local portion of] the environment’. Such a global treatment erases ‘released into the environment’ as a limitation, however, by ensuring that it is always satisfied. No substance, except perhaps an injected drug, harms anyone unless it was at least for an instant in an ‘environment’. A reading of this sort trivializes statutory language. The text makes more sense if read to refer to more widespread releases that affect strangers: asbestos wafting out of Proko’s plant and contaminating a nearby meadow, or shaken loose from insulation Proko installed in a school; asbestos *375 left behind as a contaminant when Proko closes its plant; fluids leaching into the water supply from a plant, and so on. Doubtless some of the language in the United States Code is meaningless. No institution can fill 20 linear feet of shelving with tiny type and commit no redundancies. Yet it is hard to believe that ‘released into the environment’ is an empty phrase. The focus and structure of CERCLA itself show that it has force.” (Covalt v Carey Canada Inc., supra, 860 F2d at 1436-1437 [emphasis supplied].)
For this court to accept plaintiffs’ view that section 9658 (a) (1) is triggered when chemicals are ingested by a worker and transferred solely to his spouse through sexual intercourse, and in turn, through her bloodstream to their child in útero, would render meaningless the limitation that a “release” must be “into the environment” in order for the FRCD to apply. For that reason, plaintiffs’ bodily fluid transfer theory is without merit and fails to support their proposed amendments to the complaints in Ruffing I and Ruffing II.
E. Requisite Evidentiary Showing
Assuming, arguendo, that CERCLA applied to either of plaintiffs’ two theories of environmental release, their proposed amendment would still lack merit. That is because plaintiffs have failed to offer some evidentiary showing that their claims can be supported (see, Morgan v Prospect Park Assoc. Holdings, supra, 251 AD2d at 306), as they relate to the applicable statute of limitations.
As discussed above, in those instances in which section 9658 (a) (1) applies to a personal injury action commenced in this state for latent exposure to a hazardous chemical, section 214-c is preempted to the extent that the period of limitations in which the action must be commenced is one year, measured from the date on which the cause of the injury has been discovered (see, In re Pfohl Bros. Landfill Litig., supra, 26 F Supp 2d at 531). Consequently, in order to demonstrate that there is merit to their proposed amendment, plaintiffs must offer some proof that they did not discover the cause of Ms. Pfleging’s birth defects until some date within one year of their filing of the complaint in Ruffing I.
In this case, Ms. Pfleging has given an affidavit in which she states that she and her father “were not aware of any causal connection between his contact with any particular chemical *376 substance and [her] injuries until some time after August 1993, indeed until shortly before [their] complaint was filed” (Alyssa Pfleging affidavit para 3 [emphasis supplied]). Similarly, in Mr. Pfleging’s affidavit, he asserts that he “was in no position to learn of the causes of [his] daughter’s birth defects until the time that the lawsuit was filed” (William Pfleging affidavit para 19 [emphasis supplied]). Because the complaint in Ruffing I was filed on August 13, 1996, the discovery of the cause of Ms. Pfleging’s injuries “some time after 1993” would not necessarily render the claims timely asserted.
Only by providing the court with some proof of the date of that discovery can plaintiffs meet their burden of making “some evidentiary showing” that their amendment is meritorious, since there would be no merit to a claim that is time-barred (see, Citibank [N.Y. State] v Suthers, 68 AD2d 790, 795 [4th Dept 1979] [where it is clear from original and proposed pleadings that the statute of limitations has expired, amendment would be futile and leave to amend may be denied]). Significantly, neither plaintiff has offered any details concerning the date of that discovery, so that it cannot be determined that their actions were commenced no later than one year from that date.
Obviously recognizing that failure of proof, plaintiffs argue that “neither the one-year provision of section 214-c (4) nor indeed any portion of CPLR 214-c applies to [their] [] case” because “by its own terms, CPLR 214-c shall not be applied in any action in which the alleged misconduct occurred prior to July 1,1986, and the injury was or should have been discovered prior to that date” (plaintiffs’ reply mem at 22). Invoking section 214-c (6), they contend that the three-year limitations period of section 214 applies in their case, because “the defendants’ injurious misconduct occurred prior to December 24, 1974, when the plaintiff Alyssa Pfleging was born with permanent and all too obvious limb deformities” (id. at 22-23).
Certainly, if their claims were subject to a three-year statute of limitations, they could be viewed as timely, and their proposed amendment would have merit insofar as concerns the commencement date of their action. Unfortunately for plaintiffs, their argument simply ignores one paragraph of section 214-c (6).
As also set forth above, under section 214-c (6), section 214-c applies to “acts, omissions or failures occurring prior to, on or after” July 1, 1986 (emphasis supplied). Although there are exceptions to the application of section 214-c, those are limited *377 to acts, omissions or failures: (a) which occurred prior to July 1, 1986; and (b) which caused or contributed to an injury that was discovered or through the exercise of reasonable diligence should have been discovered prior to such date; and (c) an action which was or would have been barred because the applicable period of limitation had expired prior to such date (CPLR 214-c [6]). For the exception to apply, all three conditions of section 214-c (6) must be satisfied (Rothstein v Tennessee Gas Pipeline Co., 87 NY2d 90, 94 [1995]; Forte v Weiner, 214 AD2d 397, 399 [1st Dept 1995], lv dismissed 86 NY2d 885 [1995]).
Here, as relates to Ms. Pfleging’s direct claims, only the first two conditions have been met. Although plaintiffs do not discuss the third condition, it is plain that Ms. Pfleging’s claims were not time-barred as of July 1, 1986 because of the infancy toll provided by CPLR 208, which extended the time for her to sue until three years after her 18th birthday, i.e., December 24, 1995. For that reason, her claims are subject to a one-year period of limitations commencing on the date of discovery of the cause of her injuries. Because plaintiffs have failed to provide any evidentiary showing that the discovery date was not more than one year before the filing of the complaint in Ruffing I, Ms. Pfleging’s proposed amendment would be “futile,” and must be denied (see, Citibank [N.Y. State] v Suthers, supra, 68 AD2d at 795; see also, Saferstein v Mideast Sys., 143 AD2d 82, 83 [2d Dept 1988]).
Unlike his daughter’s claims, Mr. Pfleging’s derivative claims were time-barred as of July 1, 1986, because the infancy toll does not apply to a derivative cause of action (Blackburn v Three Vil. Cent. School Dist., 270 AD2d 298, 298-299 [2d Dept 2000]). Thus, his claims would be subject to the three-year statute of limitations under CPLR 214. Nevertheless, there is no merit to his proposed amendment because, his causes of action being derivative of those of his daughter, the untimeliness of her claims would likewise require the dismissal of his (see, Karlsons v Guerinot, 57 AD2d 73, 81 [4th Dept 1977] [parent’s derivative action “draws its life from the existence of the cause of action which inures to the benefit of the infant”]).[16]
III. Conclusion
This court “acknowledge [s] that CERCLA, as all remedial statutes, must be given a broad interpretation to effect its *378 ameliorative goals” and “recognize [s] that the statute reaches far more than hazardous waste sites” (see, First United Methodist Church of Hyattsville v United States Gypsum Co., 882 F2d 862, 867 [4th Cir 1989], cert denied 493 US 1070 [1990]). Relying upon the liberal construction given to CERCLA by the courts generally, plaintiffs urge this court to render “a ruling that permits them to amend their complaint to the extent necessary to allege the applicability of [section] 9658, CERCLA’s statute of limitations provision,” based upon the proofs submitted by them which they claim “demonstrate to a fare-thee-well that there were numerous wrongful releases of chemicals from the East Fishkill facility into the environment” (plaintiffs’ reply mem at 2).
What plaintiffs actually seek on their motion is for this court to expand the definition of the term “environment” under CERCLA so as to encompass their claims that CERCLA “releases into the environment” occurred when Mr. Pfleging brought to his home hazardous chemicals which he carried on his clothing and both on and inside his body, and exposed his wife, and through her, his unborn child, to those same chemicals, notwithstanding that there was no actual release outside the confines of his home. Although this approach would “achieve ‘more’ of the legislative objectives by” expanding that definition, “it is enough to respond that statutes have not only ends but also limits,” and that “[b]orn of compromise, laws such as CERCLA and SARA do not pursue their ends to their logical limits” (Hines Lbr. Co. v Vulcan Materials Co., 861 F2d 155, 157 [7th Cir 1988]).
No one can deny that plaintiffs at bar have, and will continue to, suffer emotionally, physically and financially as a result of the horrible defects with which Ms. Pfleging was born. But the understandable desire to provide some legal remedy for every injury cannot dissuade a court from carrying out its duties, which include “find[ing] and enforcing] stopping points no less than [ ] implement [ing] other legislative choices” (see, ibid.).
The interpretation of section 9658 (a) (1) urged by plaintiffs would, in this court’s view, bring every release of a hazardous substance within the scope of CERCLA and thereby judicially eliminate the limitation placed upon the term “environment” by Congress. Because that result would “stretch the statute far beyond its intended reach” (see, First United Methodist Church of Hyattsville v United States Gypsum Co., supra, 882 F2d at 867), this court declines to do so. Accordingly, plaintiffs’ motion *379 for leave to amend their complaints in Ruffing I and Ruffing II is denied in all respects.

. The supplier defendants are Union Carbide Corporation, Eastman Kodak Company, KTI Chemicals, Inc., J.T. Baker Inc., now known as Mallinckrodt Baker, Inc., Shipley Company, LLC, Industri-Chem Laboratory, Inc., Ashland, Inc., E.I. duPont de Nemours & Company, CNA Holdings, Inc., formerly known as Hoechst Celanese Corporation, Vulcan Materials Company, Aldrich Chemical Company, Inc., Fisher Scientific Company, LLC, Olin Corporation, sued herein as Olin Corp., also known as Olin Hunt Co., EKC Technology, Inc., G.J. Chemical Co., Inc., and Aldrich Chemical Company, Inc., as successor in interest to Fluka Chemical Co., sued herein as Fluka Chemical Corp., now known as Sigma Aldrich Inc. In other complaints in this litigation, Houghton Chemical Corp. and Dexter Corporation are also named as supplier defendants.

. The defendants in Ruffing I (Westchester County Index No. 4049/97) are Union Carbide Corporation, Eastman Kodak Company, KTI Chemicals, Inc., J.T. Baker Inc., now known as Mallinckrodt Baker, Inc., Shipley Company, LLC, Industri-Chem Laboratory, Inc., Ashland, Inc., E.I. duPont de Nemours & Company and IBM. Those named as defendants in Ruffing II (Westchester County Index No. 15664/97) are CNA Holdings, Inc., formerly known as Hoechst Celanese Corporation, Vulcan Materials Company, Aldrich Chemical Company, Inc., Fisher Scientific Company, LLC, Olin Corporation, sued herein as Olin Corp., also known as Olin Hunt Co. and EKC Technology, Inc.

. Ruffing I was originally commenced in New York County. By stipulation of the parties, it was subsequently transferred to Westchester County and assigned a Westchester County Index Number.

. In a separate footnote the court stated its conclusion that even if the letter was considered, the general language asserted in the complaint would not suffice to state a claim relying upon CERCLA.

. In addition, plaintiffs have filed and served a new complaint which includes CERCLA allegations and names IBM as the only defendant. By separate decision and order this court shall address IBM’s motion to dismiss that complaint.

. Defendants also raise three procedural challenges, none of which requires extended discussion. Their contention that the denial of the earlier motion for leave to amend the complaints to assert claims under CERCLA is the law of the case and bars any further application for the same relief is without support in the record. In this case, where the prior motion was denied on the merits only to the extent that plaintiffs’ position was presented by the supporting affidavit of their counsel submitted with their papers-in-chief, because this court did not consider the affidavit offered in their reply papers, the merits of that position were not fully determined by the November 2001 decision within the meaning of the law of the case doctrine, so that the denial of the earlier motion does not constitute the law of the case on the issue of their right to amend to assert claims under CERCLA (see, Baldasano v Bank of N.Y., 199 AD2d 184, 185 [1st Dept 1993]; see also, Gilligan v Reers, 255 AD2d 486, 487 [2d Dept 1998]). Similarly unpersuasive is defendants’ argument that even if this motion is deemed as one seeking leave to renew, it fails to satisfy the standard governing such an application. Upon the papers presented, the court agrees with plaintiffs that they have sufficiently demonstrated their entitlement to renewal given the procedural history related to their claims (see, Maloney v Consolidated Edison Co. of N.Y., 290 AD2d 540 [2d Dept 2002]). Finally, while defendants are correct in their assertion that the dismissal of the complaints granted in the June 2001 decision bars plaintiffs from seeking leave to amend on a new motion with respect to the dismissed actions (see, Buckley & Co. v City of New York, 121 AD2d 933, 935 [1st Dept 1986], appeal dismissed 69 NY2d 742 [1987]; see also, Reznick v Tanen, 162 AD2d 594 [2d Dept 1990]), since the court deems the present application to be one seeking renewal of the earlier motion, this argument is unavailing.

. Under CPLR 208, an action asserting an infant’s claim which is subject to a statute of limitations of three years or more must be commenced no later than three years after the “disability” of infancy ends, i.e., upon the infant’s 21st birthday. In this case, that date was December 24, 1995, prior to the filing of the complaints in Ruffing I and Ruffing II.

. Section 309 of SARA added this section to CERCLA. For that reason, the parties often refer to section 9658 (a) (1) as section 309 in their respective papers.

. As the Cyker court observed, “the Environmental Protection Agency, charged with the implementation of CERCLA, has defined ‘ambient air’ as *366 ‘air that is not completely enclosed in a building or structure’ ” (Cyker v Four Seasons Hotels Ltd., supra, 1991 WL 1401, *2, 1991 US Dist LEXIS 1310, *6, citing 50 Fed Reg 13,462-13,463 [1985]).

. This recitation of the elements of a CERCLA recovery claim does not specifically include a release “into the environment” because “[a] release, by definition, must occur ‘into the environment’ ” (see, Reading Co. v City of Philadelphia, supra, 823 F Supp at 1238, citing 42 USC § 9601 [22]).

. It is plaintiffs’ position that it is “immaterial” that cases such as State of Vermont v Staco involve clean-up actions rather than personal injury actions “as the same CERCLA definitions apply” (plaintiffs’ mem at 12). As discussed above, the same CERCLA elements are not involved in the two classes of lawsuits, because a mere “threatened” release will support a recovery action but not a personal injury action seeking the benefit of the FRCD. Thus, to the extent that they assert that other courts “have held that chemicals transported from a worksite, such as on clothing, are releases or threatened releases into the environment under CERCLA” (ibid.), plaintiffs simply ignore the distinction in the elements of the two types of actions, as reflected in the language of the relevant CERCLA provisions (see, 42 USC § 9658 [a] [1] [FRCD applies to “releases”]; cf. 42 USC § 9607 [a] [4] [creating liability for clean-up costs “where there is a release or a threatened release”]).

. The District Court explained its rulings in the cases cited by plaintiffs at bar as follows: “This Court has found a threatened, release when hazardous dust was distributed within a warehouse because the dust could be carried out on the warehoused goods and on the clothes and shoes of employees. BCW Assoc., 1988 WESTLAW 102641 at *17. Similarly, this Court found a threatened release when PCBs were leaked onto the floor of a building because the PCBs could seep from the building (not considered the environment under CERCLA) into the environment. Reading Co., 823 F.Supp. at 1238; see also Amland, 711 F.Supp. at 793 (threatened release when PCBs might migrate through a concrete floor onto ground).” (Elf Atochem N. Am., Inc. v United States, supra, 868 F Supp at 712 [emphasis supplied].) From this explication it is clear that the possibility of a transfer of a hazardous material from what would not be considered to be part of the “environment” to another area that is considered to be an element of the environment is sufficient to meet the broadly construed term “threatened release” (see, Amland Props. Corp. v Aluminum Co. of Am., supra, 711 F Supp at 793 [courts are “inclined to give a broad reading to the term( ) * * * ‘threatened release’”]; see also, Elf Atochem N. Am., Inc. v United States, supra, 868 F Supp at 712 [“In other cases where defendants disposed of their waste onto their property, employees and products, courts have found a threatened release”] [emphasis supplied]).

. Even if the allegations of the proposed amendment supported the conclusion that the chemicals on Mr. Pfleging’s clothing or body could have been released into an element of the environment as that term is defined in *371 CERCLA, and they do not, since this is not a recovery action any such threatened release would be irrelevant.

. Indeed, the Kowalski court’s use of the phrase “release of chemicals * * * which have the potential of causing injuries” (supra, 841 F Supp at 108), is consistent with the interpretation of a “threatened release” in a clean-up action and contrary to the language of section 9658 (a) (1), which requires an actual release.

. To the extent that plaintiffs also proffer Kowalski in support of this theory, their reliance upon that decision is unavailing, for the reasons discussed above.

. In view of this determination, the court does not reach defendants’ additional argument that section 9658 (a) (1) does not preempt the pleading and proof requirements under section 214-c (4), which were not satisfied by plaintiffs’ proposed amendment.